2 Ill. App.3d 567 (1971)
275 N.E.2d 446
THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee,
v.
CHESTER HARRY DOLLEN, Defendant-Appellant.
No. 70-250.
Illinois Appellate Court  Second District.
November 11, 1971.
*568 *569 Murphy, Griffin, & Dixon, of Aurora, for appellant.
William R. Ketcham, State's Attorney, of Geneva, (W. Ben Morgan, and Leo Wotan, Assistant State's Attorneys, of Elgin, of counsel,) for the People.
Remanded with directions.
Mr. PRESIDING JUSTICE MORAN delivered the opinion of the court:
A jury found defendant guilty of the sale of narcotics. On appeal he contends: (1) that he was entrapped, (2) that the State's supplying funds to an informer to leave the area was prejudicial, (3) that the denial of a preliminary hearing was prejudicial, and (4) that the court erred in failing to grant his pretrial motion for the production of certain items.
The relevant portion of the evidence introduced by the prosecution in its case-in-chief consisted of the testimony of a State narcotics agent and an Aurora policeman in charge of narcotics. On direct testimony it was established that on February 5, 1969, the agent, along with an informer (later identified as Donald Wright) went to a taxi stand in Aurora at about 2:30 P.M. The defendant was not present when they arrived but within minutes he drove into the taxi company parking lot and approached the men. No introductions were made but the defendant remarked that he had the "stuff" at home and drove away. Upon his return, all three went into the cab office where the defendant handed the agent a box containing morphine. The agent, upon asking the price, was told $75.00; he offered $65.00 but the defendant demanded and received an additional $10.00 from the agent. The Aurora policeman observed from a distance the meeting of the three in the parking lot but *570 did not observe the actual transaction. He did state that Wright was an "informant of mine."
Cross-examination of the agent disclosed that he first met Wright one to two weeks prior to the sale (no earlier than January 22, 1969) and that he again met with Wright prior to the sale; that he gave the informer directions on the manner in which to conduct the February 5th meeting and that Wright suggested he offer $65.00 for the drugs. Prior to the sale the agent learned that the informer was a former mental patient. When asked if he had given the informer any money for his services, the agent replied, "Yes," but later, when asked if he paid the informer because of his involvement in the transaction, he said, "No, it was at his [Wright's] request to have money to get out of town with."
Cross-examination of the Aurora policeman disclosed that he had met Wright during the "extreme latter" part of January, 1969; that after the sale he learned Wright had been a mental patient; that the arrest of the defendant occurred on February 19, 1969; that the informer had approached him "several weeks after the arrest" requesting money but was directed to the agent; that Wright left town although he again saw him about 7 to 8 months before trial; and that he presently did not know the informer's whereabouts.
The defense consisted of the testimony of two cab drivers, the president of the cab company and the defendant. The defendant testified that he was the manager of the cab company and hired Wright on January 22, 1969; that soon thereafter ill feelings developed between them because of Wright's treatment of certain customers; that on or about January 28, 1969, when he arrived at the cab's garage between 5:30-6:00 A.M., Wright was standing near his taxi and Davis, another driver, was present; that he began his usual task of inspecting the cabs for lost items belonging to customers; that he found a small box in Wright's cab and said, "Look what I found"; that Wright asked to see the box and immediately stated that he could find a buyer for it; that he refused and said the box contained someone's medicine and that it would be called for; and that between this date and February 3, 1969, Wright asked the defendant to sell the box "seven or eight times at least", but was refused.
The defendant further testified that on the morning of February 4th, Wright, in a hysterical manner, again approached him and stated he had a buyer in Wisconsin whom he was going to see; that he kept repeating, "You got to help me"; that Wright told him to ask $75.00 even though the buyer might try to lower the price and said, "You keep the $75.00 for helping me out." The defendant refused, but that night Wright returned, "all shook up" and said that he was going to Wisconsin to pick up the *571 buyer and would meet the defendant the next day at 2:30 P.M. Defendant related the further statements of the informer as follows:
"He said I just had to sell it. I just had to get rid of it for him. It was going to help him. He was in trouble and he told me again, hand (sic) onto the money. Keep the money for helping me out."
Wright also told defendant to tell the buyer he could get more drugs if needed.
Defendant then related that he was approximately $1500 in debt from gambling, a fact of which Wright was aware; that the day after the sale he learned from a driver named Pass and from the president of the cab company that Wright had told them defendant had sold narcotics to an agent; that he fired Wright that same day; and that two weeks later, Wright got into one of their cabs and insisted that Davis, the driver, take him to the office of defendant, at which time Wright said, "I can blow the lid off this whole thing if you give me my job back," but the defendant refused.
On cross-examination the defendant stated that after the sale the agent called him on three occasions seeking to buy more drugs but each time, he refused, the last time telling the agent that he found the box under the back seat of a cab.
Elmer Davis testified that he was a driver for the taxicab company; that he had personal knowledge of the animosity between the men; that he and Wright were present when defendant searched the cab; that defendant found the box on January 28th; that when defendant found the box, Wright immediately stated he could find a buyer for it; that a few days after the sale, Wright, in his presence, told defendant "* * * he could get him free from what he was into if he'd give him his job back," and that, at that time, Wright said, "* * * that he had been given $50.00 to turn Chester in."
Richard Pass testified that he was aware of the ill feelings between the men and that on the day after the sale, Wright said, "I fixed Dollen. Didn't I?" The president of the cab company testified that on the same day, Wright said, "You better start looking for another manager * * * that Chester had sold narcotics to an agent and that he would be picked up within the near future."
In rebuttal, the agent testified that at the sale defendant stated he could obtain other drugs.
The informer did not testify.
 1, 2 Entrapment exists only when the criminal intent originates in the mind of the entrapping officer (People v. Outten (1958), 13 Ill.2d 21, 23.) There is no requirement that the State call the informer to testify People *572 v. Aldridge (1960), 19 Ill.2d 176, 180), but the State is responsible for the acts of its informers. People v. Strong (1961), 21 Ill.2d 320, 326.
 3 Defendant recognizes these rules but bases his argument on People v. Strong, supra, and People v. Jones (1966), 73 Ill. App.2d 55. In both cases, the unrebutted testimony was that the informer gave defendant a package and asked him to deliver it at a later time; that he did not know what the package contained; and that when he delivered the package he received money but did not know its purpose. The informer did not testify in either case. The Strong court held that the failure to call the informer gave rise to an inference against the State and on the basis of defendant's unrebutted testimony found a valid defense of entrapment. The Jones court, relying on Strong, found entrapment where "critical elements" of the State's case depended upon the work of an informer and the informer was not called to rebut defendant's testimony. Defendant argues, on the basis of these, that the State must call an informant to controvert defense evidence which "suggests" he supplied the drugs.
We disagree. Jones and Strong are distinguishable on their facts because, in each, the defendant testified that the State supplied the narcotics. The courts then inferred the truth of defendant's testimony from the State's failure to call the informer. In the case at hand defendant's unrebutted testimony was not that the informer supplied the drugs, but that he found the box in the informer's taxicab. Were we to apply the rule of Strong and Jones to these facts, we would first have to infer that the informer placed the drugs in the cab. Then in order to find entrapment, we would be required to use that inference as a basis for a second inference regarding the truth of defendant's testimony. We will not engage in speculating on the existence of entrapment where the evidence merely "suggests" the informer supplied the drugs.
 4 We note that the testimony regarding the source of the drugs need not come from the defendant and need not be direct, but it must place the drugs in the informant's previous control.
 5 In considering defendant's contention that the State's paying the informer to leave the area was prejudicial, we find no such prejudice. The question of paying an informer to leave is considered in People v. Wilson (1962), 24 Ill.2d 425 and People v. Williams (1968), 40 Ill.2d 367. Both arose out of the same factual situation. The informer did not testify. Defendant testified that the reason she obtained the narcotics was because of the informer's request for help for an addict friend. A federal narcotics agent testified that he drove the informer and a man described as her husband to a railroad to a railroad station in a government automobile. *573 He watched them buy train tickets, put them on the train, and gave the informer $60. A few days earlier he had given her $700. The State resisted defendant's pretrial motion to produce the informer and at all times gave her address as the local office of the Federal Bureau of Narcotics. The court found a denial of due process on the basis of the affirmative, willful conduct of the State. No such denial of due process exists in the case at hand. The secretive nature of narcotics sales necessitates the use of informers. That the State may pay these people is a well established, though sometimes offensive practice. Here, unlike Williams and Wilson, defendant made no motion to produce the witnesses and there was testimony that Wright had in fact returned and been seen in the area during the period before trial. Although we hold, in the case at bar, that there was no error we must note that paying a police informer money so that he can leave town before a trial is reprehensible conduct that should be avoided.
 6-9 Defendant's next contention is that the denial of a preliminary hearing was prejudicial. The record shows that the scheduled preliminary hearing was delayed over defendant's objection. An indictment was returned during the period of the delay. The evidence does not disclose whether Wright was paid and left before or after the scheduled hearing or the indictment. It is well established that there is no constitutional right to a preliminary hearing. (People v. Petruso (1966), 35 Ill.2d 578, 580.) Its purpose is not to try the case or provide discovery for defendant but to determine probable cause. Thus where a true bill is returned, probable cause has been found and the need for a preliminary hearing is eliminated. People v. Gonzales (1970), 125 Ill. App.2d 225, 234 recognizes the possibility that a hearing might be required where defendant shows some fundamental unfairness which infected the trial. Here, however, defendant has not shown any connection between the postponement, the indictment and the informer's leaving town which could be said to have deprived him of a fundamental constitutional right. We, therefore, find no merit to his contention.
 10, 11 Defendant's final contention concerns his pretrial motion for all affidavits, receipts and documents signed by Wright and for "Any and all records of Illinois Division of Narcotics pertaining to Wright * * *" The motion was "* * * granted only if the witness Donald Wright is called as a witness by the State." The trial court properly ruled on the motion. The trial was held prior to the promulgation of the Revised Rules As To Discovery In Criminal Cases (to become effective October 1, 1971). Under present law, defendant is entitled to a witness' statement if the witness is called to testify but not entitled to "any and" all other information *574 contained in police records which might aid in preparation of his defense. People V. Thomas (Ill. App. 1971), 267 N.E.2d 703; People v. Hoagland (1967), 83 Ill. App.2d 231.
 12 On August 16, 1971, the "Uniform Narcotic Drug Act," under which the defendant herein was sentenced, was repealed and replaced by the "Controlled Substances Act" (Ill. Rev. Stat. 1971, ch. 56 1/2, par. 1100-1603). Section 601 (Ill. Rev. Stat. 1971, ch. 56 1/2, par. 1601) provides that the penalties of the new Act apply if, prior to the effective date of the Act the judicial proceedings had not reached a final adjudication. On August 16, 1971, the defendant's case had not reached a final adjudication. (See People v. McCloskey, (Gen. No. 70-190 2nd District, 1971) (Ill. App.3d).) Contrary to the old Act the new Act's penalties are dependent upon the quantity of the substance involved. The record before us does not disclose the quantity involved, and therefore, we must remand this case to the trial court with directions to hold further proceedings in accordance with the provisions of the new Act.
Cause remanded with directions.
GUILD and STROUSE, JJ., concur.