(No. 44361.

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee,
v. MICHAEL CHUPICH, Appellant.

*Opinion filed January 26, 1973.—Modified on denial of rehearing*
*March 27, 1973.*

WARD, J., took no part.

FREDERICK F. COHN and WILLIAM E. LASKO II, of Chicago, appointed by the court, for appellant.

WILLIAM J. SCOTT, Attorney General, of Springfield, and EDWARD V. HANRAHAN, State's Attorney, of Chicago (JAMES B. ZAGEL, Assistant Attorney General, and ELMER C. KISSANE and STEPHEN J. CONNOLLY, Assistant State's Attorneys, of counsel), for the People.

MR. JUSTICE SCHAEFER delivered the opinion of the court:

On May 10, 1967, a jury in the circuit court of Cook County found Michael Chupich, the defendant, guilty of the unlawful sale of narcotics, and he was sentenced to imprisonment in the penitentiary for not less than 25 nor more than 60 years. The appellate court affirmed in an abstract opinion. 132 Ill. App. 2d 302, 270 N.E.2d 106.

On leave granted to appeal, the defendant argues that

the trial court erroneously admitted highly prejudicial evidence against him, that the jury was not properly instructed, and that the conduct of the prosecutor in his examination of a witness and in his summation deprived the defendant of a fair trial. In a supplemental petition, the defendant urges that the case should be remanded for resentencing under the Illinois Controlled Substances Act. Ill. Rev. Stat. 1969, ch. 56½, par. 1100 *et seq.*

Charles Adams, a narcotics agent employed by the State, was the principal prosecution witness. He testified that in July of 1965, Robert Hannah was working for him as a "special employee." Shortly after midnight on July 31, 1965, Adams and two other agents met Hannah in a restaurant on the north side of Chicago. Adams and Hannah then proceeded to the apartment of Hannah's mother and father. The defendant was there when they arrived. Adams testified that Hannah took a paper bag which contained two envelopes from a desk in the living room and that Adams and Hannah went to the kitchen where Adams field-tested the contents of one envelope. The test indicated the presence of heroin.

Hannah then called the defendant into the kitchen and Adams asked what he wanted for the entire bag. The defendant replied that he wanted $1200 for each envelope. Adams said he only had $100 with him but could get the rest of the money by afternoon. The defendant said he was expecting a phone call and would find out what kind of arrangements could be made. Shortly thereafter the phone rang and Mrs. Hannah called the defendant to the phone. Thereafter the defendant gave Adams some of the contents of the bag and Adams gave the defendant $100. Later that day he and other State narcotics agents listed the numbers of $1100 in bills which Adams and Hannah took to the apartment. When they arrived, the defendant, a woman named Betty Riddiford, and Hannah's mother and brother were present. Adams gave the defendant the $1100 and the defendant took a paper bag from his pocket and

delivered it to Adams. Adams also testified that the defendant was arrested in November of 1965.

Robert Hannah's mother corroborated the testimony of Adams as to the physical events that occurred in her apartment. She also testified that her son was under indictment for the sale of narcotics at that time, and that he had told her that he had to produce three arrests in order not to "have to worry" about the charge against him.

The defendant's position was that his arrest for selling heroin was the result of a frame-up by Robert Hannah, who, in order to extricate himself from his own indictment, was making a case for the agents. Elizabeth Riddiford, the only witness called by the defense, testified that she had conspired with Hannah to implicate the defendant. She testified that Hannah had invited the defendant to the apartment and had there given him two sealed bags, the contents of which were unknown to the defendant, for delivery to Charles Adams, a State narcotics inspector, and that the defendant then turned over the money received from Adams to Hannah. She testified that she had brought the defendant to Mrs. Hannah's house to fix the television set; that once he was there Hannah asked the defendant to do him a favor and hand a package to a certain person who was coming to the house, saying that he (Hannah) owed that person money and if he delivered the package himself that person would not give him the money—" and Mike went along with it, Mike didn't realize what was going on— *** Charley Adams came to the house and Bob [Hannah] introduced him as a friend of his named Charley. The envelope was passed, he handed Mike the money and after Charley was only there for a few minutes and then when Charley left Mike handed Bob back the money ***."

Prior to trial the defendant moved for a change of place of trial, and in support of that motion alleged that the case had been set for trial on March 10, 1967; that "on

or about the 23rd day of February, 1967, during the penderey [*sic*] of the instant cause there appeared by the various news media, television, radio and newspaper of and throughout Chicago, Illinois, the County of Cook and the jurisdiction of this Court an extensive amount of news coverage which highly publisized [*sic*] the fact of the death of one, Robert Hannah, a prosecution witness in the instant cause."

The newspaper stories attached to the motion reported that Hannah's mother said that he had disappeared on January 30, four days before he was to testify in a narcotics case. His frozen body was found in a wooded area with a dime frozen to his shirt. He had been shot several times. The stories also reported that his mother said that her son had been warned not to testify against Chupich on February 3 in a case growing out of the sale of narcotics in 1965. One of the newspaper accounts contained the following statements:

> "The defendant in the February 3 case, according to state narcotics investigator Charles Adams was Michael (Little Mike) Chupich, an ex-convict.
>
> Adams said he purchased a quantity of high grade heroin for $1200 in 1965 from Chupich—a sale that was arranged by Hannah.
>
> Hannah went along as a prosecution witness to view the sale in a Waveland Avenue apartment, according to Adams. Adams said Chupich was not arrested at the time because it was hoped that larger purchases could be arranged.
>
> Meanwhile, he said, Chupich disappeared and was not found again until late in 1965. The court case had been pending since then."

The motion for change of venue was denied, but the case was continued until May 8, 1967, at which time the trial commenced.

The defendant does not contend that the evidence failed to establish his guilt beyond a reasonable doubt, nor does he attack the ruling of the trial court upon his motion for a change of place of trial. His principal contentions in

this court center upon the following occurrences that took place during the testimony of Elizabeth Riddiford:

On cross-examination the prosecution asked: "Did Michael Chupich threaten you that something was going to happen to your children if you didn't come in and testify?" The witness answered, "Michael Chupich, no." The attorney who represented the defendant in the trial court first objected, and then said, "Ask her who threatened her." Her attention was then directed to a specific time and place by the prosecutor and she was asked:

> "And did you at that time tell Sergeant Harmon and Agent Dumaine that Michael Chupich had told you if you didn't testify as he wanted you to you would never see your children again?
> A. No sir, I never said that."

On redirect examination the following occurred:

> "Q. Were you in fact threatened, Betty?
> A. Yes, sir.
> Q. By who?
> A. I was told that if I did appear in court I could not have my children and my children were taken away from me.
> Q. And is there presently pending against you certain charges in the state court of this state concerning your children?
> A. Yes, sir, the police took them away, Jerry Harmon."

Sergeant Jerome Harmon then testified that on March 27, 1967, in his presence, and in the presence of FBI Agent Raine Dumaine, the witness had stated "that she had to testify for Mike because if she didn't that she would never see her children again."

In this court the defendant first argues that the trial court "erred in failing to hold a hearing as to whether the statement used for impeachment of a defense witness was coerced from the witness by police threats." The witness denied that she made such a statement, but we may assume that in the case of an ordinary witness, as in the

case of a defendant, such a denial does not preclude a defendant from insisting upon proof of the circumstances under which the statement was made. (*People v. Cook (1965), 33 Ill.2d 363; People v. Norfleet (1963), 29 Ill.2d 287; Lee v. Mississippi (1948), 332 U.S. 742, 92 L. Ed. 330, 68 S. Ct. 300.*) Nevertheless, it does not appear that there was any need in this case for an inquiry into the voluntariness of the statement.

What happened here, as we read the record, is that the prosecution, on cross-examination of the witness Riddiford, sought to prove spoliation—that the defendant had attempted to force her to testify in his favor by threatening the safety of her children if she did not. The defendant's attorney at once joined issue, stating before the jury, "Ask her who threatened her." The witness denied threats by the defendant but on redirect examination testified that the police had threatened to take her children from her, and had done so. The prosecution then offered the testimony of Sergeant Harmon that the witness had said that the defendant had threatened her children if she did not testify for him.

In all of this the focus was upon threats that were aimed either at inducing the witness to testify for the defendant or at preventing her from doing so, and not upon the motivation for the statement that Officer Harmon attributed to her. No request for a preliminary hearing as to voluntariness was made, and in these circumstances we conclude that none was required.

The defendant next argues that the judgment must be reversed because the trial judge did not instruct the jury that the prior inconsistent statement could be used only for purposes of impeachment and not as substantive evidence of guilt. Officer Harmon's testimony concerning Mrs. Riddiford's prior statement was admissible to show her inconsistency, unreliability and possible bias, but it was not admissible to show that the defendant had in fact threatened her. The defendant was entitled, upon request,

to an instruction limiting the inferences to be drawn from this evidence. He did not request such an instruction, and the usual rule is that one who fails to request an instruction cannot thereafter complain of its absence.

The defendant urges, however, that *People v. Paradise (1964), 30 Ill.2d 381,* and *People v. Tate (1964), 30 Ill.2d 400,* established exceptions to the usual rule which are broad enough to encompass the present case. We do not agree. In each of those cases the prior statement of the witness named the defendant as the perpetrator of the crime, and thus bore directly upon his guilt. In this case the prior statement was that the defendant had threatened her, not that the defendant had sold the heroin. Moreover, in *Paradise* (p. 385) we commented upon "the extraordinary length and repetition of the impeachment testimony," and in *Tate* upon the argument of the prosecution, which enhanced the possibility that the evidence might be considered substantively. In this case there is no analogous circumstance emphasizing the necessity for a limiting instruction.

The instructions that were given to the jury defined the offense in the language of the statute, which does not mention knowledge. The State concedes that knowledge is an element of the offense, and the defendant argues that failure to so instruct the jury requires reversal. No such instruction was requested. It has been held that where a defendant's knowledge of the nature of the substance involved has been the subject of genuine dispute, failure to instruct the jury that knowledge must be proved is reversible error. (*People v. Lewis (1969), 112 Ill. App. 2d 1, 11; People v. Castro (1971), 1 Ill. App. 3d 537.*) Other cases have held that where the defendant's knowledge is proved beyond a reasonable doubt, failure to instruct the jury on this element was harmless error. *People v. Keating (1971), 2 Ill. App. 3d 884, 890; cf. People v. Truelock (1966), 35 Ill.2d 189* (possession of narcotics).

In this case we are of the opinion that the appellate

court properly rested its decision on the latter ground. The evidence cannot fairly be said to have raised a reasonable doubt as to the defendant's knowledge of the contents of the envelopes. The witness Riddiford testified that the defendant did not know what was going on, but she was not present during the defendant's first visit to the Hannah apartment. The evidence is uncontradicted that on that occasion the defendant was in the apartment when Adams and Robert Hannah arrived, and when they took the envelopes to the kitchen to test their contents. It is not disputed that on that occasion the defendant stated the price for the narcotics, received the phone call with respect to the terms upon which he could sell them, and delivered some of the powder from one of the envelopes to Adams, for which he received $100. Lack of knowledge cannot be seriously argued on this record.

During his cross-examination of Betty Riddiford the prosecutor asked:

> "Q. Have you ever been in a mental institution?
> A. No, I'm sick right now."

Here the court sustained the defense counsel's objection, but Mrs. Riddiford continued:

> "The Witness: I have been in the hospital and I have been sick but not in a mental hospital. I have got hepatitis. I have a temperature right now. \*\*\*."

The prosecutor returned to this subject in his closing argument.

> "[The prosecutor.] I, in questioning her, said something. I asked her the question was she ever in a mental institution and maybe I shouldn't have asked that question because I —
> [The defense counsel.] I object to that again because that question was objected to at the time. He didn't present one iota of evidence —
> [The prosecutor.] I was about to say that I have no knowledge she was in a mental institution. I hope —
> [The defense counsel.] He is at it again, Your Honor, and I object —
> The Court: Sustained. The objection is sustained.

[The prosecutor.] But her actions on the witness stand were rather bizarre and rather unusual. ***"

The prosecutor's question was improper. (*People v. Nash* (1966), 36 Ill.2d 275.) Neither the prosecutor's belated admission that his question had no basis, nor the usual instruction directing the jury to disregard statements of counsel not based on the evidence could completely nullify the prosecutor's strategically timed insinuation. In a case in which the proof was less convincing than this one, such conduct would warrant reversal.

The defendant was convicted under the Uniform Narcotic Drug Act (Ill. Rev. Stat. 1965, ch. 38, par. 22–3), which was repealed by the Illinois Controlled Substances Act. The latter act became effective August 16, 1971, and it provides in section 601:

"Prosecution for any violation of law occurring prior to the effective date of this Act is not affected or abated by this Act. If the offense being prosecuted would be a violation of this Act, and has not reached the sentencing stage or final adjudication, then for purposes of penalty the penalties under this Act apply if they are less than under the prior law upon which the prosecution was commenced." Ill. Rev. Stat. 1971, ch. 56½, par. 1601.

Section 8–2–4 of the Unified Code of Corrections contains a substantially identical provision:

"Prosecution for any violation of law occurring prior to the effective date of this Act is not affected or abated by this Act. If the offense being prosecuted has not reached the sentencing stage or a final adjudication, then for purposes of sentencing the sentences under this Act apply if they are less than under the prior law upon which the prosecution was commenced." Ill. Rev. Stat., 1972 Supp., ch. 38, par. 1008–2–4.

The defendant in this case, and other defendants in pending cases who were sentenced before the effective dates of these statutes, contend that the quoted provisions entitle them to resentencing. Two appellate courts have held that a case has not been finally adjudicated within the meaning of this language until the last direct appeal has

been decided, or the time for filing such an appeal has expired. (*People v. Bailey (4th Dist. 1971), 1 Ill. App. 3d 161; People v. McCloskey (2d Dist. 1971), 2 Ill. App. 3d 892; People v. Isom (4th Dist. 1972), 4 Ill. App. 3d 407; People v. Dollen (2d Dist. 1971), 2 Ill. App. 3d 567, rev'd on other grounds (1972), 53 Ill.2d 280; People v. Keating (2d Dist. 1971), 2 Ill. App. 3d 884.*) Two justices of this court have expressed the same view. See *People v. McCabe (1971), 49 Ill.2d 338,* at 351-2.

The State takes a contrary position in this case, relying first upon the decision of the Supreme Court of the United States in *Bradley v. United States (1973),* —— *U.S.* ——, *35 L. Ed. 2d 528, 93 S. Ct. 1151,* which construed the following provisions in the Federal Comprehensive Drug Abuse Prevention and Control Act of 1970: "Prosecutions for any violation of law occurring prior to the effective date of [the Act] shall not be affected by the repeals or amendments made by [it] \*\*\* or abated by reason thereof." The Supreme Court had taken jurisdiction to resolve a conflict among the circuit courts of appeal, and in its decision stated:

> "Rather than using terms in their everyday sense, 'the law uses familiar legal expressions in their familiar legal sense.' [Citation.] The term 'prosecution' clearly imports a beginning and an end. [Citations.]
>
> \*\*\* In the legal sense, a prosecution terminates only when sentence is imposed. [Citations.] So long as sentence has not been imposed, then, section 1103(a) is to leave the prosecution unaffected." —— *U.S.* ——, ——, *35 L. Ed. 2d 528, 532-533, 93 S. Ct. 1151, 1154.*

The *Bradley* case is not helpful here because the Federal statute there involved contains only language equivalent to the first sentence of the statutes involved in this case. It contains no provision like the second sentence of our statutes, and it is that sentence with which we are concerned. It should also be noted, however, that even if

we were concerned only with the definition of "prosecution," that word is defined as follows in section 2—16 of our Criminal Code: " 'Prosecution' means all legal proceedings by which a person's liability for an offense is determined, commencing with the return of the indictment or the issuance of the information, and including the final disposition of the case upon appeal." Ill. Rev. Stat. 1971, ch. 38, par. 2—16.

In *Bradley v. United States,* it was pointed out that: "At common law, the repeal of a criminal statute abated all prosecutions which had not reached final disposition in the highest court authorized to review them. [Citations.] Abatement by repeal included a statute's repeal and re-enactment with different penalties. [Citation.] And the rule applied even when the penalty was reduced." (——— U.S. ———, ———, *35 L. Ed. 2d, 528, 531-532, 93 S. Ct. 1151, 1154.*) In Illinois the common-law rule was long since modified by section 4 of our Statutory Construction Act, which provides: "No new law shall be construed to repeal a former law *** as to any offense committed against the former law, or as to any act done, any penalty, forfeiture or punishment incurred ***. If any penalty, forfeiture or punishment be mitigated by any provisions of a new law, such provision may, by the consent of the party affected, be applied to any judgment pronounced after the new law takes effect." (Ill. Rev. Stat. 1971, ch. 131, par. 4.) This provision, as applied to the Criminal Code of 1961, was held to mean "that a punishment mitigated by a new law is applicable only to judgments after the new law takes effect." *People v. Hansen (1963), 28 Ill.2d 322, 341.*

It is clear that the General Assembly did not intend the Statutory Construction Act to govern the imposition of penalties under the statutes now before us. If it had, the provisions involved in this case would not have been necessary, and would not have been enacted. Each of these provisions states that if the "sentencing stage or final adjudication" has not been reached, the sentences under

the new act shall apply if they are less than those provided in the old act. We turn, therefore, to a consideration of the meaning of "sentencing stage or final adjudication."

The State argues that "the only logical interpretation to be given the phrase 'final adjudication' is that it means a final appealable order other than the sentence of the trial court. Thus both 'sentencing stage' and 'final adjudication' refer to the final judgment of the trial court." And because under Rule 604 (Ill. Rev. Stat. 1971, ch. 110A, par. 604) a defendant who has been found guilty and placed on probation "may appeal from the judgment and may challenge the finding of guilty and the conditions of probation," it is argued that an order placing a defendant on probation is the "final adjudication" contemplated by the statute.

This argument equates an interlocutory order which has been made "final" for purposes of appeal with a "final adjudication." The two are not equivalent. Under the State's analysis, either the reference to "sentencing stage" or the reference to "final adjudication" is redundant. And that analysis disregards the fact that a defendant is not placed on probation until the sentencing stage has been reached. Section 5—6—2(e) of the Unified Code of Corrections provides: "A sentence to probation or conditional discharge is a final judgment for purposes of appeal." (Ill. Rev. Stat., 1972 Supp., ch. 38, par. 1005—6—2(e).) And numerous other sections of that Code similarly refer to "sentences" to probation. See Ill. Rev. Stat., 1972 Supp., ch. 38, par. 1005—1—18; 1005—5—3 (d)(1); 1005—6—1; 1005—6—2(a); 1005—6—3(c), (d).

We are of the opinion that "sentencing stage" and "final adjudication" do not mean the same thing, and that the appellate courts have correctly held that the penalties provided in the Controlled Substances Act are applicable to cases pending upon direct appeal. The same result will follow under the Unified Code of Corrections.

The Controlled Substances Act provides a maximum

sentence of 20 years for delivery of less than 30 grams of any substance containing heroin. (Ill. Rev. Stat. 1971, ch. 56½, par. 1401(b).) The record does not clearly indicate the total amount of controlled substances involved in this case. On remand the circuit court will determine whether the Controlled Substances Act prescribes a lesser penalty than the sentence imposed. If it does, the circuit court shall resentence the defendant.

The judgment of the appellate court is affirmed, and the cause is remanded to the circuit court of Cook County, with directions.

*Affirmed and remanded, with directions.*

MR. JUSTICE WARD took no part in the consideration or decision of this case.