THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JAMES BARKSDALE, Defendant-Appellant.

First District (2nd Division)    No. 61020

Opinion filed September 28, 1976.—Rehearing denied January 31, 1977.

Paul Bradley and Lynn Sara Frackman, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon and Michael J. Polelle, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE JIGANTI delivered the opinion of the court:

Defendant James Barksdale was found guilty in a jury trial of rape and of deviate sexual assault. He was sentenced to consecutive terms of 75 to 150 years for rape and 4 to 14 years for deviate sexual assault.

On appeal defendant contends:

I. That the evidence is insufficient to establish defendant's guilt beyond a reasonable doubt,

II. that the trial court erred in prohibiting defendant from directly questioning jurors on voir dire examination,

III. that the court erred in not granting defendant a continuance when the court-appointed public defender assumed the defense function midway through the trial; and

IV. that the sentences imposed were excessive in that (a) they were based on improper evidence of prior alleged incidents, and in that (b) the consecutive sentences were in violation of section 5—8—4(c) of the Unified Code of Corrections. The facts will be related as they pertain to each of the issues presented for review.

## I

On appeal defendant first contends that the evidence is insufficient to establish beyond a reasonable doubt that defendant engaged in sexual intercourse or in any act of deviate sexual assault with complainant by use of force and against her will.

The following is complainant's testimony regarding the occurrences of Saturday, March 18, 1972.

Complainant, a young white woman, arrived at the Greyhound Bus Depot on Randolph Street in downtown Chicago at about 3 p.m., from Michigan City, Indiana, where she had been visiting friends. She was on her way home to Fond du Lac, Wisconsin, but the bus she was to catch

was not scheduled to leave until 6:30 p.m. During the waiting period she placed a long distance phone call to her sister in Fond du Lac.

During this call she was interrupted by defendant, a black male, who attempted to engage her in conversation. She told him to keep quiet because she was making a long distance phone call. Defendant continued to stand next to complainant. When she finished her phone call she walked to a row of chairs about 15 feet away and sat down. Defendant followed, sat next to her, and again attempted to strike up a conversation with her. Defendant did all the talking. He told her he was a social worker who worked with runaway young people and repeatedly invited her to come with him to his office in Old Town to meet the people with whom he worked.

After about 15 minutes complainant got up and walked to the soda fountain which is located on an upper level of the depot. The defendant again followed complainant and repeated his requests that she come with him to visit his office. Complainant finally agreed to walk two blocks with him because she thought that was the only way to "get rid of" defendant. He stated that after two blocks if she did not want to go any further she could turn around and come back. They left the depot together. Defendant did not threaten or touch complainant at that time.

After they had walked two blocks, defendant led complainant down a flight of stairs to Lower Wacker Drive as a route which defendant described as a "short cut" to the agency where he worked. Although it was light on the street above, it was dark on the lower level. The sidewalk was 75 feet from the highway and there were no people walking down there. They continued to walk for half a block and then defendant tried to pull complainant into a room containing trash cans and other refuse. Complainant screamed and endeavored to flee. She fought with defendant, pulled of his glasses and threw them to the ground. She cried and begged him to let her go, but defendant hit complainant and forcibly dragged her into the darkened room where he forced her to perform an act of oral intercourse. When she tried to refuse, defendant hit her on both sides of the head and on the chest and threatened to kill her. Defendant told her he had two razor blades, but complainant never saw them. He then ordered her to take off her clothes and lie down. When she refused, he again struck her on the head and chest and threatened to kill her if she did not comply. Defendant then pushed her down and forced her to submit to sexual intercourse with him. The complainant then put her clothes back on.

Thereafter, complainant begged him to take her back to the bus station. Defendant cautioned complainant not to cut herself on a nail on which he had just cut his hand. He agreed to take her back to the depot. On the way back complainant did not cry out or seek assistance from passers-by. Her

intention was to summon police assistance as soon as she got back to the bus station. When they arrived there, the defendant permitted her to go to the washroom. Once inside the ladies' room, she told the matron in attendance that the man outside had beaten and raped her and asked the matron to call the police. Complainant was crying and hysterical.

Complainant's behavior and conduct after entering the ladies' room was confirmed by the testimony of Rose Dameron, a matron employed by the Greyhound Bus Terminal, who testified that at about 6 p.m., on the day in question, complainant entered the washroom and screamed that a man outside was going to kill her. The matron left and returned with two security guards. Complainant identified defendant as her attacker.

Melvin Kaiser, a security guard for Greyhound, was on duty at the time. He testified that after receiving an emergency call he and his partner went toward the ladies' washroom and noticed defendant leaning against the wall near the washroom. As Kaiser approached, defendant started to walk away. Kaiser asked where he was going in such a hurry and defendant answered that he had to catch a bus. However, when asked, defendant was unable to produce a ticket and said that he must have lost it. Kaiser noticed that defendant's pants were "wrinkled" at the time and that defendant's coat sleeves were "all dusty and dirty."

Chicago Police Officer, John Jakubosky, testified that, at about 6 p.m., he and his partner received a call to proceed to the Greyhound terminal. Upon arrival he saw the two Greyhound security guards, the defendant, and the complainant whose face and chest were red. Scratches were evident on her chest. Jadkubosky also noticed that the complainant's sweater and bra were torn.

Investigator Leo Dorociak of the Chicago Police Department testified that, when he saw the complainant at police headquarters on that evening, she had bruises about the face and chest as well as scratches on her chest. The front of her sweater was ripped. Both sides of her face were bruised and swollen at the cheekbone level. The defendant, after he had been advised of his rights at police headquarters, told Dorociak that he had never left the bus station and had never had sexual intercourse with the complainant.

At trial it was stipulated that the complainant's bra was torn and that a vaginal smear taken from complainant at Mercy Hospital that evening showed the presence of human spermatozoa. The complainant testified that she was bleeding from the vagina at the time the smear was taken.

Defendant argues that, although he did not testify, complainant's own testimony is sufficient to cast doubt on the State's allegations that the sexual acts were by force and against her will. Complainant testified that she voluntarily walked with defendant to Lower Wacker Drive; that,

although defendant threatened her with razor blades, she saw no weapon; that after the acts of intercourse, defendant cautioned her not to cut herself on an exposed nail on which he had just injured his hand; that she returned with him to the bus depot without crying out or seeking assistance from passersby; that defendant waited for her outside the ladies' washroom after returning her to the bus station; and that complainant declined to confront defendant after she had identified him to security guards.

Defendant argues that all of this conduct is inconsistent with complainant's allegation of forcible rape, but rather supports defendant's contention that the complainant voluntarily engaged in acts of intercourse with him which she afterward regretted.

However, defendant does not explain or take into consideration the corroborated testimony of complainant's crying and hysterical behavior after the incident, her torn sweater and bra, the bruised and scratched condition of her head and chest as noticed by the security guards and police officers, and her testimony of vaginal bleeding which militate against defendant's consent argument. Nor does he explain how his statement to Investigator Dorociak that he had never left the bus station with, nor had any sexual relations with, the complainant is consistent with his contention of consent.

■■ In a conviction for rape, while the evidence must prove the act was against the will of complainant, there is no definite standard for determining the amount of resistance required. Such a determination must be made from the facts and circumstances of each case. (*People v. Montgomery* (1974), 19 Ill. App. 3d 206, 311 N.E.2d 361.) The issue of whether the acts of intercourse were forcible or consensual is ultimately one of credibility. In this regard, it is neither the duty nor the privilege of a reviewing court to substitute its judgment as to the weight of disputed evidence or the credibility of witnesses for that of the trier of fact who heard the evidence presented and observed the demeanor of the witnesses. (*People v. Novotny* (1968), 41 Ill. 2d 401, 244 N.E.2d 182.) It is peculiarly the province of the jury to weigh the evidence, judge the credibility of witnesses, and determine the facts. A reviewing court will not set aside a jury's verdict of guilty unless the evidence is so palpably contrary to the verdict or so unreasonable, improbable or unsatisfactory as to cause a reasonable doubt as to the guilt of the accused. (*People v. Reese* (1973), 54 Ill. 2d 51, 294 N.E.2d 288.) In the instant case the complainant's testimony was positive and credible and corroborated by the matron at the bus depot, the security guards, the police officers, and the hospital personnel. We see no reason to set aside the jury's finding of guilty.

## II

Defendant next contends that the trial court erred in not allowing the defendant to directly question prospective jurors on voir dire examination.

On July 9, 1973, prior to trial, defendant moved that he be allowed to represent himself *pro se* in the matters pending before the court. Defendant's motion was granted and at the same time the court appointed an attorney from the public defender's office to act as *amicus curiae*. That same day defendant filed a motion to suppress identification testimony of a witness and other motions. A hearing on the motion to suppress was held September 24, 1973. At that time defendant requested a jury trial and the court explained the procedure which would be used for jury selection as follows:

> "Under our law, Mr. Barksdale, you will have ten challenges. The State will have the same number of challenges. I will ask all of the questions of the jurors. Do you wish any questions asked, you will submit them to me in writing and I will pass upon those questions before I begin examination of the jurors. That goes for the State as well. If you wish any questions asked specifically with regard to the voir dire examination of jurors, you can submit those questions in writing and I will pass on those at the time I receive them."

Defendant immediately objected to the procedure outlined by the court because he felt that he should be able to converse with each juror individually. After a brief recess during which defendant conferred with the attorney who had been appointed to counsel him in matters of law and procedure, the court heard testimony on defendant's motion to suppress and denied the motion. On September 25, 1973, defendant supplied the court with questions which he requested be asked of prospective jurors. The following morning the court went over all submitted questions in great detail with the defendant and the State. Defendant afterward indicated that the questions to be asked of the jury were to his satisfaction. Over the next few days the court questioned 33 jurors. Both defendant and the State were allowed to supplement this questioning with additional questions which were to be submitted in writing. Because at one point the defendant found it difficult to write down his suggestions for supplemental questions, the court, after warning defendant again of the difficulties of proceeding *pro se*, allowed defendant to present his questions orally, although the State was given no such privilege.

Defendant argues that, although the trial court did submit questions to each juror regarding their racial attitudes and their residence in a changing neighborhood, these questions were "insufficient to elicit deeply rooted racial prejudices." Defendant complains specifically that the court

declined to ask two particular jurors whether they were engaged in any racial integration efforts. Despite the court's refusal of that question, the defendant nevertheless declined, after consultation with his legal advisor, to exercise any of his available preemptory challenges against either of these two jurors.

In support of his contention that it was error for the trial court to have refused to allow any direct questioning of prospective jurors under Supreme Court Rule 234 (Ill. Rev. Stat. 1971, ch. 110A, par. 234), the defendant cites *People v. Lobb* (1959), 17 Ill. 2d 287, 161 N.E.2d 325, and *People v. Carruthers* (1974), 18 Ill. App. 3d 255, 309 N.E.2d 659. In *Carruthers* at pages 260-61 the court stated:

> "[I]t appears, under the authority of *Lobb*, that direct questioning of prospective jurors by the parties or their attorneys during voir dire examination is not to be totally prohibited. (See *Street v. Finney* (1973), 9 Ill. App. 3d 638.) * * *
>
> We do not conclude, however, that the procedure employed by the trial court in the instant case, if error, was so prejudicial to the defendants as to require a new trial. In *Lobb* the court stated that a failure to permit pertinent inquiries to enable a party to ascertain whether the minds of the jurors are free from bias or prejudice which would constitute a basis for challenge for cause, or which would enable him to intelligently exercise his right of peremptory challenge, may constitute reversible error."

The court in *People v. Fleming* (1975), 36 Ill. App. 3d 612, 345 N.E.2d 10, in a situation analogous to *Carruthers*, concluded that a prohibition against direct questioning need not constitute reversible error unless the defendant establishes that he was somehow prejudiced by the refusal to allow personal interrogation of the jurors.

■■ In the instant case after review of the record we find that the trial court made every reasonable effort to protect the defendant from possible prejudice and to see that a fair and impartial jury was impaneled. We find no resulting prejudice to the defendant in that he was not allowed to ask two prospective jurors whether they were engaged in any racial integration efforts. We agree with the conclusion in *People v. Turner* (1975), 27 Ill. App. 3d 239, 326 N.E.2d 425, which states at page 243:

> "While direct questioning of prospective jurors by the parties or their attorneys is not to be wholly prohibited under Supreme Court Rule 234, after a careful examination of the record we find the restriction was not so prejudicial as to constitute reversible error."

From his initial objection to the procedure and his argument on appeal, defendant was apparently under the erroneous impression that voir dire examination is the proper medium through which the defendant should be allowed to be able to establish personal rapport with the prospective

jurors. To the contrary, the Committee Comments to Rule 234 (Ill. Ann. Stat., ch. 110A, par. 234, Committee Comments at 262 (Smith-Hurd 1968)) indicate that voir dire is meant to select an impartial jury but not to "influence the jurors in favor of the examining lawyer and his case * * *." Clearly the influencing of jurors is one of the abuses Rule 234 was designed to remedy.

## III

Defendant's next contention on appeal is that, when it became necessary for the public defender to assume the defense function midway through the trial, he should have been granted a continuance to enable him to familiarize himself with the case.

As we noted earlier, the defendant herein elected to proceed *pro se*. The trial court, at all stages of the proceedings, repeatedly cautioned the defendant that such a course could be deleterious to his defense, but defendant persisted. At the time the motion was granted for defendant to defend himself *pro se*, the trial court appointed an assistant public defender to act as defendant's legal advisor. The public defender was present at pretrial hearings, voir dire, and all subsequent stages of the proceedings, and defendant was granted considerable leeway by the court to consult with his advisor as frequently as he desired to do so.

When, in cross-examining the complainant, defendant found it difficult, even after consulting his advisor, to lay a proper foundation for possible impeachment of the complainant's testimony, he asked the public defender to assume the defense counsel function. Out of the presence of the jury, the public defender stated for the record that it would be necessary for him to pursue the defendant's theory of the case (defendant alleged a political conspiracy against him) which defendant had already advanced and presented to the jury, since the defendant had not indicated any other available theory of defense. The defendant agreed that he would be satisfied to have the public defender appointed at that time. Neither the public defender nor the defendant requested a continuance but proceeded to resume the trial with no objection.

The cases cited by defendant on appeal involve denials of motions for continuances. In the instant case there was no such motion, and no indication that the court would not have granted additional time if the defendant or his attorney had thought it necessary. The Illinois Supreme Court case of *People v. Coleman* (1970), 45 Ill. 2d 466, 468-69, 259 N.E.2d 269, is dispositive of the matter.

In *Coleman* the defendant on appeal argued that he had not been given an adequate opportunity to confer with the public defender and that counsel had not had sufficient time to investigate and subpoena witnesses.

"Yet neither defendant nor his appointed counsel ever suggested to

the trial court that their conferences were hindered by a lack of privacy, and there was never a request for a continuance for any purpose. The court had no reason to believe that additional time was needed for preparation or that any prospect existed for fruitful investigation. There was never any intimation whatever by the court that a continuance would not be allowed if requested. The court did not hasten the defendants to trial; the Public Defender voluntarily announced ready for trial following his second conference with the defendants. There has been no suggestion by defendant that he somehow felt constrained, against his will or judgment, to acquiesce in the Public Defender's decision to proceed to trial, and therefore we must conclude that defendant desired to go forward without delay. It cannot be the court's constitutional duty to order a continuance on its own motion for the supposed benefit of a defendant, when his appointed counsel announces ready for trial directly following a conference with the defendant. As we have stated before, 'The rule well established by the decisions of this court is that it is only where the record shows that the trial court has abused its discretion in denying a reasonable time for the preparation of a defense that a reviewing court will interfere. (*People v. Street*, 353 Ill. 60; *People v. Terry*, 366 Ill. 520; *People v. Conn*, 391 Ill. 190 *certiorari* denied 326 U.S. 791.) Thus in the absence of a showing in the record that defendant either requested or was refused additional time in which to prepare his defense, we must hold his present contention to be without merit.' *People v. Kendall*, 7 Ill. 2d 570, 572, *cert.* denied, 351 U.S. 957, 100 L. Ed. 1479, 76 S. Ct. 857; accord, *People v. Jones*, 9 Ill. 2d 481, 483."

■■ An examination of the record in the instant case shows that neither defendant nor his attorney requested a continuance, nor apparently, did they feel one was needed. We can see no prejudice resulting from the alleged lack of preparation. On the contrary, the public defender had been advising the defendant at all stages of the proceedings, had been present in court for pretrial motions and voir dire, and had been consulted frequently by defendant.

## IV
### (a)

Defendant next contends that his consecutive sentences of 75 to 150 years for rape and 4 to 14 years for deviate sexual assault are excessive.

At the hearing in aggravation and mitigation the undisputed evidence showed that defendant had been convicted on August 12, 1958, of two separate counts of rape, one count of robbery, and one count of assault

with intent to commit robbery. He was sentenced to not less than 25 years on each of the rapes, 10 to 20 years for robbery and 10 to 14 years for assault with intent to commit robbery. He was paroled in April of 1965 and returned to Illinois State Penitentiary in October, 1965, for violation of that parole. In November, 1967, he was reparoled and discharged in February, 1970. On November 3, 1972, defendant was convicted of rape, deviate sexual assault, and aggravated kidnapping and was sentenced to 50 to 100 years for the rape, 10 to 14 years for deviate sexual assault, and 50 to 100 years for aggravated kidnapping. (As noted above the events which are the subject of the instant case took place in March of 1972.) In addition the evidence showed that defendant had received a general discharge from the Navy because of his inability to adjust to Navy life.

■■ The trial court in evaluating the above evidence, noted defendant's contention that the witnesses were involved in a political vendetta against him because of his racial integration activities, summarized the facts of the instant case, and expressed the need for deterrent sentences to protect the community from the threat of rape. Defendant does not contend that these were improper considerations in assessing sentence. We feel that on this alone the sentences imposed by the trial court could be sustained. Our supreme court in *People v. Tobe* (1971), 49 Ill. 2d 538, 546, 276 N.E.2d 294, observed that the trial judge through his observation of the trial and the hearing in aggravation and mitigation is in a superior position to decide the question of punishment.

Defendant maintains, however, that the testimony of two young women who testified in aggravation and mitigation that the defendant had raped and committed deviate sexual assault against them on two separate occasions in July of 1971 was prejudicial and inflammatory and should not have been considered by the court in assessing sentence.

The first witness testified that she and a girlfriend, both aged 16 at the time, were kidnapped and raped by defendant at gunpoint on July 29, 1971. The second witness testified that she was 15 years old on July 9, 1971, when defendant raped and assaulted her. Both young women and Officer Gerald Kirkham, who testified that he arrested defendant on the latter charge, were subjected to extensive cross-examination.

It is apparent from the record that the trial court considered this testimony in assessing sentence. Defendant argues that this was error in that the sentence was therefore based on unproved allegations of prior misconduct. At the time of the hearing in aggravation and mitigation, defendant had not been convicted of either crime and the record is unclear as to whether or not indictments were pending.

In support of this argument defendant cites several cases including *People v. Crews* (1967), 38 Ill. 2d 331, 231 N.E.2d 451; *People v. Riley*

(1941), 376 Ill. 364, 33 N.E.2d 872; *People v. Wilson* (1973), 11 Ill. App. 3d 693, 297 N.E.2d 277; and *People v. Hayes* (1973), 55 Ill. 2d 78, 302 N.E.2d 37, which involved the consideration of hearsay statements by the trial court in assessing penalties. These cases are distinguishable from the instant case in that the evidence here did not entail written reports from a social worker of the statements made by a 4½ year old boy where neither the child nor the social worker were present in court as in *Crews*, nor stale 20-year old arrest reports where there had been no convictions as in *Riley*, nor "three sheets of prior arrests" without convictions as in *Wilson*, nor consideration of an unidentified document read into the record concerning prior misconduct of defendant over objection of defense counsel as in *Hayes*. In the instant case the witnesses were present in court and were available for, and in fact subjected to extensive cross-examination by defense counsel.

It would appear that the sentencing standards of *People v. Adkins* (1968), 41 Ill. 2d 297, 242 N.E.2d 258, are applicable here. In *Adkins* our supreme court stated at page 301:

> " ' * * * The rules of evidence which ordinarily obtain in a trial where guilt is denied do not bind the court in its inquiry. It may look to the facts of the [crime], and it may search anywhere, within reasonable bounds, for other facts which tend to aggravate or mitigate the offense. In doing so it may inquire into the general moral character of the offender, his mentality, his habits, his social environments, his abnormal or subnormal tendencies, his age, his natural inclination or aversion to commit crime, the stimuli which motivate his conduct, and, as was said in *People v. Popescue*, [345 Ill. 142], the judge should know something of the life, family, occupation and record of the person about to be sentenced.' *People v. McWilliams*, 348 Ill. 333 at 336. See also *People v. Popescue*, 345 Ill. 142; *People v. Mann*, 27 Ill. 2d 135; Ill. Rev. Stat. 1967, chap. 38, par. 1—7(g)."

■■ We believe that the trial court properly considered the testimony as it was material and relevant to assist the court in its inquiry into the general moral character of the defendant, his natural inclination or aversion to commit crime, and his abnormal or subnormal tendencies. For the above stated reasons we do not find the sentences to be excessive.

## IV
### (b)

Finally defendant contends that the trial court erred in making the sentences of 75 to 150 years for rape and 4 to 14 years for deviate sexual

assault consecutive since such consecutive sentences are in violation of section 5—8—4(c) of the new Unified Code of Corrections (Ill. Rev. Stat., 1973 Supp., ch. 38, par. 1005—8—4(c), which came into effect January 1, 1973, and which provides:

(c) The aggregate maximum of consecutive sentence shall not exceed twice the maximum term authorized under Section 5—8—1 for the most serious felony involved. *The aggregate minimum period of consecutive sentences shall not exceed twice the lowest minimum term authorized under Section 5—8—1 for the most serious felony involved. \* \* \*"* (Emphasis added.)

The defendant in the instant case was sentenced November 7, 1973, for an offense committed in 1972. He, therefore, had the option of being sentenced under the old code which was in effect at the time of the offense and which would have allowed such consecutive sentences (Ill. Rev. Stat. 1971, ch. 38, par. 1—7), or under the new code, as above, which provides that the aggregate minimum of the consecutive sentences could not exceed eight years which is twice the statutory minimum for the more serious felony of rape. For reasons upon which we cannot speculate, the defendant chose to be sentenced under the old code.

None of the recent Illinois Supreme Court cases governing the interpretation of the statute in question are precisely on point since in *People v. Nicks* (1976), 62 Ill. 2d 350, 342 N.E.2d 360; *People v. Williams* (1975), 60 Ill. 2d 1, 322 N.E.2d 819; *People v. Morgan* (1974), 59 Ill. 2d 276, 319 N.E.2d 764; and *People v. Chupich* (1973), 53 Ill. 2d 572, 295 N.E.2d 1, it appears that the defendants were sentenced while the old code provision regarding consecutive and concurrent sentences was in effect and the new code provision as stated above came into effect only after their cases were on appeal. They had no opportunity to elect between the old and new codes. In the instant case the record indicates that the defendant and his attorney were aware of both the old code and new code provisions which were effective at the time of defendant's sentencing, November 7, 1973. The defendant chose to be sentenced under the *old* code which would allow the sentences to run consecutively as rendered. However, defendant contends that, even though he has chosen the old code, he should have the benefit of the new code provision on consecutive sentences.

■■ In *Williams* at page 17, the court said the defendant was entitled to "the benefit of the more favorable intervening statute." We believe that even though the cases are distinguishable, the same rationale should apply here and that the defendant should have the benefit of the more favorable statutory provision regarding consecutive sentences. We remand to the circuit court with directions to issue an amended mittimus indicating that

the sentence for deviate sexual assault is to run concurrently with the sentence for rape.

The judgment of the circuit court is affirmed in part and reversed in part with directions.

Judgment affirmed in part; reversed in part with directions.

STAMOS, P. J., and HAYES, J., concur.