**People of the State of Illinois, Plaintiff-Appellee, v. Freddie Adams, Defendant-Appellant.**

**Gen. No. 52,752.**

First District, Fourth Division.
October 8, 1969.

Gerald W. Getty, Public Defender of Cook County, of Chicago, for appellant.

Edward V. Hanrahan, State's Attorney of Cook County, of Chicago, for appellee.

MR. PRESIDING JUSTICE DRUCKER delivered the opinion of the court.

Defendant appeals from a conviction, after a jury trial, of the offenses of rape and robbery. Judgments were entered and the defendant was sentenced on the rape count for not less than ten nor more than fifteen years and on the robbery count for not less than five nor more than ten years, the sentences to run concurrently. Defendant raises two points on appeal: (1) he was not proven guilty beyond a reasonable doubt; and (2) that since his identification by the complaining witness was doubtful, vague and weak, his alibi evidence should not have been disregarded.

Testimony of Wynice Thomas, Complaining Witness:

She is married and lives at 4023 West Polk. On June 10, 1966, at approximately 9:00 p. m., she drove to the home of her husband's cousin to visit a sister-in-law. The prosecutrix, her sister-in-law, and her cousin then drove to a tavern and had a beer. They left and drove to another tavern near Pulaski and Lexington. They each had another beer and then drove back to the cousin's house and sat in the car and talked. About 2:00 a. m. the prosecutrix drove home after stopping for some barbecue and parked the car in front of her house. She got out of the car and a man approached her from the rear and

asked for money. She said she had about $50 from work and handed him her purse which he refused to touch. He told her to get the money out and give it to him.

The man was wearing work clothes with a dark, waist-type jacket and a cap. She gave him the money and asked him what else he was going to do to her. She was told to shut up. She asked the man not to harm her but he again told her to shut up. The man had her by the arm and kept the other hand in his jacket pocket as if he had something. He walked her across the alley from her house and through a gangway to the back of some stairs. He told her to undress and lie on the ground. She did as she was told. All this time he had his hand in his jacket pocket. The man then got on top of her, put his hand over her eyes, and had intercourse.

When he finished he told her to stay there until he left. After a couple of minutes she got up, walked across to her house and rang the doorbell. She was crying and nervous. However, when she first walked in, she did not say anything to her husband. She had the barbecue and her undergarments in her hands. As she was walking towards the bathroom she put the barbecue on the table. The first time she said anything to her husband was when he asked her what was wrong. She told him she had been raped and robbed. She then went into the bathroom and took a douche.

Later that night she went to the hospital. She was with the defendant for approximately thirty to forty minutes and identified him in court.

About two weeks after the attack she identified the defendant in a lineup consisting of four men, all Negroes, of different weights and heights.

There are no streetlights in front of or directly across from her house. The only lights are at either end of the block near the corners. She did not see the man come up behind her and could not recall which hand he used to grab hold of her arm or take her money. She did

not yell for help at any time. The man did not rip any of her clothes nor did he strike her. She suffered no cuts or lacerations. The man had one hand over both of her eyes but she did not know where the other hand was. She was not held down.

On June 12, 1966, she picked out a photo of the defendant at police headquarters. She said it was similar— looked something like the man. When asked by the defense if she couldn't be sure if the photo of the defendant was the man, she answered, "That's correct."

On June 28, 1966, a police officer came to her home and showed her a single photograph of the defendant. He told her the man in the photo was in the lineup. She was then driven down to the Maxwell Street Station where approximately three or four hours after viewing the single photograph of the defendant she viewed a lineup. She recognized and identified the defendant.

The complaining witness testified that the photograph she was shown on June 12, 1966, and the one shown to her on June 28, 1966, were not the same. When she saw the single photograph of the defendant on June 28, 1966, she was not shown the earlier picture. When asked if the man in the two photos was the same she answered, "It was a good resemblance."

Testimony of Willie Thomas, called by the State:

He is the husband of Wynice Thomas. On June 11, 1966, at approximately 3:00 a. m. he was home with his children. He heard the doorbell ring and let his wife in. She was crying and he asked her what was wrong. She said, "I got raped and robbed!" She was carrying her girdle in her hand. She went to the bathroom to take a douche while he called the police. His wife had left home about 8:30 or 9:00 p. m., later came back, and then left again.

Upon cross-examination he stated that his wife went out at 1:30 or 2:00 a. m. on June 11 and drove over to

his aunt's house. His wife had picked up his sister and Georgia Lee, his cousin, about 9:00. They returned to his house about 12:00 and left again about an hour and a half later. His wife did not tell him she was going to stop at Lexington and Pulaski but only asked if she could bring him some food. There had been no drinking at his house.

At a prior hearing held on November 3, 1966, the witness testified that his sister had called his wife so that that she could be picked up. However, at trial the witness stated that he made a mistake in that his sister did not call for his wife to come and get her. Mr. Thomas also testified at the previous hearing that his sister came over at 11:00, but at the trial he stated she arrived at 12:00 or 12:30.

He stated that his wife's coat was dirty when she came home and that she had "gloves in her hand."

Testimony of Thomas Keevers, called by the State:

He is a detective assigned to the Homicide and Sex Section of the Chicago Police Department. He was present at the lineup where the defendant was identified. Three Negro police officers dressed in plain clothes participated in the lineup along with the defendant. All were of various heights and weights.

Upon inspection of the premises where the rape took place Officer Keevers found small impressions in the dirt made by woman's high heels. On the evening of June 10 Mrs. Thomas was wearing high heeled shoes. The witness did not know when these impressions were put into the ground.

Testimony of Doctor Ronald Tosto (by stipulation):

Doctor Tosto is a resident doctor at Cook County Hospital and examined Mrs. Thomas on June 11, 1966, at approximately 4:45 a. m. He performed a microscopic examination of the contents of a vaginal smear which

proved negative for the presence of sperm. The vaginal area showed no sign of laceration or presence of trauma.

Testimony of George Anderson, called by the defense:

He lives at 1247 South Pulaski with his wife and children. He is a carpenter employed by Commonwealth Builders. He has known defendant for four years.

The defendant came by his home about 6:00 p. m. on June 10, 1966, to go to Northlake with him. The witness left about 9:00 with his wife Rose, Adams and Willie Davis. They drove to 43rd and Michigan to put racing tires on the car and arrived at Crosby Standard at 10:00 or 10:30 p. m. The tires were changed and they waited for John Wesley Brown to finish work.

At 11:00 George, Rose, Willie, John and the defendant drove to a bowling alley in Northlake, Illinois. They arrived at 12:00 or 12:30 a. m. The witness then left to drag race while John, Willie, Rose and the defendant remained behind. The witness later returned to the bowling alley at 1:00 or 1:30 and then drove back to Chicago with John, Rose, Willie and the defendant, arriving at Cooper's Lounge, located at 16th and Kostner, at approximately 2:30 a. m.

The witness further testified that they all left the lounge close to 3:00 and drove to Kostner and Ogden to drag race. He had about fifteen races with Henry Moore and finished about 5:30 in the morning. Defendant was not out of witness' sight except when witness left the bowling alley in Northlake and when he was drag racing with Moore.

Testimony of Rose Anderson, called by the defense:

She is the wife of George Anderson and lives with him and their children. She has known the defendant for four years and considers him a good friend. Her testimony substantiates that of her husband except that the defendant never left her presence from the time they left her home at 6:00 or 6:30 p. m. to 5:00 or 5:30 a. m.

366

on June 11, 1966, when John, Willie and the defendant dropped her off at her home.

Testimony of John Wesley Brown, called by the defense:

He lives at 4417 West Lexington. He has known defendant for four years. On June 10, 1966, he was working at Crosby Standard when the defendant, Hank Moore, Willie Davis and George and Rose Anderson drove in around 10:30 p. m.

The witness then testified in substance to the same events as described by George and Rose Anderson. He corroborated their statements that the defendant was with them at all times and places mentioned between the hours of 10:30 p. m. June 10, 1966, and 5:30 a. m. on June 11, 1966.

OPINION

The defendant contends that he was not proven guilty beyond a reasonable doubt because the testimony of the prosecutrix was not clear and convincing and lacked adequate corroboration, and because the testimony of defendant's alibi witnesses had been disregarded even though the complaining witness' identification was doubtful, vague and uncertain.

 Our Supreme Court has held that the testimony of a prosecutrix, uncorroborated by other witnesses, may be sufficient to justify a conviction if her testimony is clear and convincing. People v. White, 26 Ill2d 199, 186 NE2d 351; People v. Szybeko, 24 Ill2d 335, 181 NE2d 176; and People v. DeFrates, 395 Ill 439, 70 NE2d 591. However, it is also well settled that where prosecutrix's testimony is not of such clear and convincing character, and the defendant denies the charge, her testimony should be corroborated by other facts or evidence in the case. People v. Faulisi, 25 Ill2d 457, 185 NE2d 211; People v. Hiller, 7 Ill2d 465, 131 NE2d 25.

 Based upon the record before us, we do not believe that the testimony of the complaining witness,

by itself, is sufficiently clear and convincing to sustain defendant's conviction of rape. Several elements tend to weaken the probative force of her testimony. A conviction for rape can only be sustained if the victim's will to resist has been overborne, and satisfactory evidence must be introduced to demonstrate that the act was against her will. People v. DeFrates, 33 Ill2d 190, 210 NE2d 467; People v. Elder, 25 Ill2d 612, 186 NE2d 27. The issue must be determined by all the facts and circumstances in each particular case. People v. Flowers, 98 Ill App2d 289, 240 NE2d 761. In the instant case the complaining witness made no outcry nor did she call for help during the entire encounter with her attacker. The State seeks to justify this failure by stating that it would have been futile for her to yell or scream as she feared for her life. In support of this contention the State cites People v. Elder, supra, wherein the complaining witness was accosted by a man who had his right hand in his jacket pocket as though he were concealing a weapon. However, while the defendant Elder lay on the ground, the complaining witness was able to struggle free and escape, and she ran screaming for help making an immediate complaint to the first person she found.

In the case before us Mrs. Thomas testified that she undressed herself, lay down and that the defendant then put one of his hands over her eyes but she did not know what he did with the other. She also stated that the defendant did not hold her down. In addition, she did not run screaming from the scene of the alleged rape complaining to the first person she saw. Instead, she got up, put on her coat, picked up her undergarments, gloves and barbecue food and went home. At no time did she make an outcry for help nor did she try to escape. Thus, from the evidence presented, it appears that she was not gripped or paralyzed by fear as would have made any acts of resistance useless or foolhardy, and

368

the Elder decision is not controlling. People v. DeFrates, 33 Ill2d 190, 194, 210 NE2d 467.

We note that the doctor's examination of complaining witness showed no sign of laceration or presence of trauma.

■ The record also does not show that the complaining witness spontaneously or voluntarily complained of the attack upon her. When her husband answered the door she made no statement to him but rather walked over to a table and set the food down. She made no mention of the attack upon her until asked by her husband what was wrong. This failure to make a timely complaint further weakens complainant's testimony. Therefore, considering the record as a whole, we are of the opinion that the testimony of the complaining witness was not sufficiently clear and convincing to lead to a conviction and thus required corroboration by some other fact, evidence or testimony.

We do no believe that the State introduced sufficient corroborative testimony to lead to an abiding conviction of guilt. In People v. Szybeko, 24 Ill2d 335, 339, 181 NE2d 176, the court said:

> Evidence that the prosecutrix made a complaint soon after the commission of the offense is indeed accepted for the purpose of corroborating her testimony, but to be admissible and to have corroborative value, the complaint must have been made voluntarily and not in response to questions and answers, and must have been a spontaneous outburst or expression of the prosecutrix's outraged feelings, rather than a mere recital of past events. (People v. Cappalla, 324 Ill 11; People v. Romano, 306 Ill 502.)

■ In support of its contention that the complaining witness' declaration to her husband was spontaneous, the State cites People v. Damen, 28 Ill2d 464, 193 NE2d

25, wherein a police officer first asked the prosecutrix "what happened?" and she then stated she had been raped. As the court stated at page 472, "The fact that the officer asked complainant 'what happened' is, we believe, insufficient to destroy its spontaneity. People v. Harrison, 25 Ill2d 407."

However, in the Damen case a police officer testified that the complainant was bleeding from the head, breast and back when he first arrived and inquired as to "what happened?" In the instant case, no such situation exists. Mrs. Thomas suffered no cuts or bruises nor was she struck by the defendant. After the alleged attack she put on her coat, gathered together her undergarments and barbecue food and went home. She made no immediate complaint to her husband when she first entered but rather put the food on a table and walked towards the bathroom. Only after being asked by her husband what was wrong did she state that she had been robbed and raped. Thus from the physical condition of the complaining witness and her conduct when she first saw her husband, we cannot say that she made a spontaneous declaration of outraged feelings at the first opportunity, and the Damen case cannot be relied upon by the State to prove the spontaneity of her declaration.

The State also urges as corroborative testimony the fact that upon inspection of the rape scene Officer Keevers found small impressions in the dirt which had been made by high heeled shoes. The complaining witness had been wearing such shoes the evening of June 10, 1966. This testimony was weakened when Officer Keevers admitted that he did not know when the impressions were made and no testimony was elicited from the complaining witness stating that she wore high heeled shoes the morning of June 11, 1966.

Furthermore, the defendant contends that his identification by the complaining witness was doubtful, vague and uncertain while his alibi evidence was positive and

370

unimpeached. In People v. Gardner, 35 Ill2d 564, 571, 221 NE2d 232, the court stated:

> Although it is true that the testimony of a single witness, if it is positive and the witness credible, is sufficient to convict even though it is contradicted by the accused, (People v. Pride, 16 Ill2d 82; People v. Renallo, 410 Ill 372; People v. Guido, 52 Ill2d 204, 208–09,) in this case the identification of the defendant by the complaining witness was weakened by several factors, while the defendant's alibi was positive and unimpeached.

In the instant case the testimony of the complaining witness as to defendant's identity is not clear, convincing and positive. She testified that the defendant came up from behind her in the middle of the block, where no streetlights are used, asked for money and then walked her across an alley and through a gangway to the back of a house and that during the time of intercourse the defendant had one of his hands over her eyes. However, no testimony was introduced by the State showing whether the alley or the gangway was lighted, or if the complaining witness ever had a full, front, well-lighted view of the defendant. In addition, the complaining witness did not make a clear and positive identification of the defendant from the photographs she was shown on June 12, 1966, just one day after the alleged rape and robbery. She stated that the photograph she picked out was similar— looked something like the man who attacked her, but she was not sure. When she was shown the single good-sized photograph of the defendant on June 28, 1966, she was not shown the earlier photograph of June 12, 1966. She testified that the two pictures were not the same and, when asked if the man in each picture was the same, she stated, "It was a good resemblance." After viewing the single photograph of the defendant on June 28, 1966, the complaining witness was taken to the Maxwell Street Police Station to view a lineup. This lineup was held ap-

proximately three or four hours after the time she was shown the single photo of the defendant, and the same police officer who drove the complaining witness down to see the lineup stated that the man in the photo was Mr. Adams and that "the man in the lineup was the man in the photo."

For these reasons we believe that the identification of the defendant by the complaining witness was vague, uncertain and weak, and highly suggestive.

■■■ The defense offered the testimony of three alibi witnesses. Two of these witnesses stated that they were with the defendant the entire evening of June 10, 1966, and early morning hours of June 11, 1966, when the crime allegedly occurred. The State did not impeach these witnesses nor did it introduce any testimony which denied or refuted their statements. As the court stated in People v. Gooden, 403 Ill 455, 461, 86 NE2d 198:

> Evidence of an alibi cannot be disregarded where the only evidence contradicting it rests upon the identity of the defendant as the man who committed the crime charged, and while the identification and whereabouts of the defendant when the crime was committed are questions for the jury, yet where, from the entire record, there is a reasonable doubt of the guilt of the defendant because of the uncertainty of identification, the conviction cannot stand. (People v. Ricili, 400 Ill 309; People v. Burr, 356 Ill 452; People v. McPheron, 354 Ill 381; People v. Steinbuch, 306 Ill 441.)

■■ After a careful examination of all the evidence, we do not believe that defendant's guilt was proven beyond a reasonable doubt. We therefore reverse the judgment.

Reversed.

ENGLISH and LEIGHTON, JJ., concur.