THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
CHARLES BARBER, Defendant-Appellant.

First District (5th Division)    No. 77-1451

Opinion filed March 16, 1979.—Rehearing denied April 27, 1979.

WILSON, J., dissenting.

Barry S. Frazin, of Chicago (Barbara Frazin Weiner, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger, Linda Dale Woloshin, and Thomas Bucaro, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE LORENZ delivered the opinion of the court:

Following a bench trial defendant was convicted of one count of rape and two counts of deviate sexual assault (Ill. Rev. Stat. 1973, ch. 38,

pars. 11—1, 11—3) and was sentenced to concurrent terms of four to seven years on each offense. On appeal defendant contends that he was not proved guilty beyond a reasonable doubt.

The following pertinent evidence was adduced at trial.

*For the State*

Complainant testified that at approximately 7:10 p.m. on November 12, 1974, she was waiting for a ride home in the foyer of the Behavioral Science Hall at the University of Illinois Circle Campus on Morgan and Harrison Streets in Chicago. A man approached her from the rear. As she attempted to step out of his way, she turned around and observed him from a distance of "about a foot," under the fluorescent lights of the hall. She identified this man in court as defendant Charles Barber. Defendant came up to her, put one arm around her neck, placed a knife at her neck with his other hand, and said "shut up and don't move." He pulled her backwards about 20 feet into the farthest toilet stall in a women's washroom. She obeyed his order to cover her head with her coat and to remove her pants and underpants. Defendant then forced her to submit to acts of anal, oral and genital intercourse. During this sequence of events, complainant was unable to see defendant's face or upper torso because her vision was obstructed by her coat. She caught a glimpse of the knife in defendant's hand which she described as having a four-inch silver blade, approximately a half- or quarter-inch wide. Following the performance of the sexual acts, defendant told her that he thought he heard her friend outside, and that while he checked she was not to move. She stayed where she was while defendant left, returned a few seconds later, and told her not to move, to "shut up," and to keep the coat over her head. Complainant then heard a voice which she recognized as Steve Liebovitz's, a friend of hers, calling her name. She screamed his name and he entered the washroom. The assailant was no longer there. Subsequently, Liebovitz and two of her other friends took her to the campus police station. There she described her attacker to the police as a black male, 5'8" tall, wearing a brown leather jacket, a striped shirt, and dark blue pants. Defendant also wore a dark blue wool cap. After she received treatment in the hospital, she was taken to the police station, accompanied by her friends and fiance. At the station approximately two hours after the incident, she viewed a lineup consisting of five black men of various heights and weights. She picked out defendant as her assailant based upon his face and clothing. Complainant identified a photograph in court as an accurate portrayal of the lineup she saw that night and acknowledged that defendant was wearing a red wool cap in the picture.

On cross-examination, she recalled telling Chicago police officers that she was able to observe defendant "for a few minutes" just before he

attacked her and stated that because her coat covered her head during the incident, that was her only opportunity to observe his upper torso. She recalled that as she looked at him as he walked towards her, she did not see anything, including a paper bag, in his arms. She recalled that he had no facial hair or glasses. She estimated that the foyer where she was when attacked was "quite a distance" and "about the length of the building" from her class, which she had left after it ended at 7 p.m. She therefore estimated the attack occurred at approximately 7:05 p.m. or 7:10 p.m. and ended at approximately 7:20 p.m. or 7:25 p.m. She stated that she thought defendant's pants were of a denim material, although she did not touch them, and acknowledged that she did not see a red cap protruding from his pockets.

*Steve Liebovitz*

On November 12, 1974, he drove his car to the Behavioral Science Building on the corner of Harrison and Morgan in order to pick up complainant after her class. He went into the building at 7:20 p.m. or 7:30 p.m., but noticed that the hallway was empty. He called complainant's name, received no response, and went upstairs to use a phone directory. About one half minute later, he returned downstairs, called her name again and began walking towards the women's washroom. A man approximately 5′5″ tall, 165 lbs., with a medium black complexion, stuck his head outside the door of the washroom for about 10 seconds and then went back inside. This man, whom he identified in court as defendant, had pulled his coat over the top of his head so that only his face and the front of his shirt were exposed. Within 30-60 seconds, defendant walked out of the washroom, passed him at a distance of approximately 3½ feet, and walked out of the building. He continued to walk toward the washroom, entered it, and discovered complainant, in a prone position, naked from the waist down. He later went to a Chicago police station, viewed a lineup, and identified defendant as the man he saw exiting the washroom. Defendant was wearing the same jacket he had seen him in earlier, and he realized that it was all leather, and not suede with shoulder patches as he had first thought.

On cross-examination, he acknowledged that at the preliminary hearing he testified that he began walking towards the washroom after the man stuck his head out the door, and not before as he stated at trial. He further admitted that he testified at the preliminary hearing that when he first saw the offender he only caught a glimpse of his face, that he told the police that defendant's jacket was suede with patches, and that he knows the difference in appearance between leather and suede. He acknowledged that before viewing the lineup, he identified defendant from a group of five photographs shown to him by the campus police, and that defendant was the only one of the five persons in the

photographs to also appear in the lineup. He stated that he did not speak with complainant between the incident and their arrival at the police station.

*Thomas Moran*

He was employed as a police officer at the University of Illinois in Chicago on November 12, 1974. At approximately 7:30 p.m., complainant arrived at the campus police station accompanied by three friends. She was crying and shaking and told him that she had been attacked at about 7:10 p.m. or 7:15 p.m. by a black man, 5'8" to 5'10" tall, 140-160 lbs., wearing a brown waist length jacket and dark pants. He broadcasted the description over the radio and escorted complainant to the hospital. A second broadcast was transmitted that night adding that the coat was leather and had two colors.

On cross-examination he acknowledged that his written report of the incident does not refer to the description or the second broadcast he testified to. The facts in his report pertaining to the assault were told to him by Officer Sonya Worth who had spoken to the complainant in detail about the attack, while he had not.

*Charles Johnson*

On November 12, 1974, he was a police officer at the University of Illinois and was on duty in a marked squad car. Between 7:45 p.m. and 8 p.m. he received two or more radio transmissions describing a suspect that was 5'6" to 5'9", 140-150 lbs., wearing a brown suede or leather, two-tone waist length jacket and dark trousers. At approximately 7:48 p.m. he saw defendant standing at a bus stop on the southwest corner of Harrison and Halsted, approximately two blocks from where the attack had occurred. He drove by defendant slowly to get a better look at him, and decided that he fit the description he had received. Defendant was wearing a striped shirt, a waist-length leather jacket with stripes on the bottom, dark trousers, and a maroon knit hat. He placed defendant under arrest at 7:55 p.m. and a pat-down search he conducted with the assistance of police officers Atwood and Bell, revealed that defendant was carrying a pocket knife.

On cross-examination, he acknowledged that in his police report he recorded defendant's jacket as brown suede, not brown leather. The State stipulated that his police report states that he first saw defendant at 7:55 p.m. and not at 7:48 p.m. as he testified on direct. He did not recall whether a bottle of wine was recovered from defendant. He recalled that when he asked about his comings and goings, defendant showed him a bus transfer.

*Charles Atwood*

On November 12, 1974, he was a University of Illinois police officer. He responded to a radio call at 7:50 p.m. and proceeded to Harrison and

Halsted. Lieutenant Johnson and defendant were on the corner when he arrived. The knife taken from defendant had a three-inch blade and a yellow handle. Defendant was carrying a bottle of wine about three-quarters full and a bus transfer. The nearest liquor store was one block to the north. After transporting defendant to the police station at 1140 South Morgan, Atwood had a conversation with Steve Liebovitz, to whom he showed photographs. After viewing the photographs, Liebovitz selected defendant's. At the subsequent lineup, Liebovitz and the complainant separately identified the defendant.

On cross-examination, he acknowledged that defendant told him that he had been at Jones Commercial High School and was on his way home. He conceded that his report indicated that he monitored the call at 7:55 p.m. He conceded that he did not inquire at the liquor store one block north on Halsted whether defendant had purchased wine there. He admitted that he did not submit defendant's underclothing to the laboratory for testing.

*For the Defense*
*Edward Danielson, Chicago Police Officer*

At approximately 8:05 p.m. on November 12, 1974, he was present during the interview of complainant which was conducted primarily by another police officer. The interview took place subsequent to complainant's receipt of medical treatment at the hospital. He could not recall complainant stating during the interview that she observed her attacker prior to being approached from the rear. Refreshing his recollection with his case report, he agreed that it did not mention any period of observation by complainant of her attacker. On cross-examination he stated that it was possible for her to have said that she saw the attacker without his having written it down.

A stipulation was entered into by the State and the defendant that the bus transfer in defendant's possession at his arrest was assigned to Alvin K. Brown, a C.T.A. bus driver.

*Alvin K. Brown, C.T.A. bus driver*

On November 12, 1974, he was assigned to the Harrison run, which originated at State and Harrison. He explained the various punch holes on the bus transfer. The bus transfer was issued between the boundaries of 1500 east and 2500 west and he was driving his bus westbound. It was stamped "8:00 p.m." This meant that it was issued between 7:45 p.m. and 8 p.m., because C.T.A. rules require that times punched on transfers be rounded towards the next ¼ hour. In his experience it takes "eight minutes at the most" to travel from State and Harrison to Harrison and Halsted. In his experience no one has ever gotten on a bus, asked for a transfer and stepped back off.

On cross-examination, he admitted it was possible to board a bus at 7:45 p.m., ride a couple of blocks and receive a transfer punched in the manner of defendant's. He admitted that it was not unusual for people to ride only a block or two. He acknowledged that he sometimes punches transfers in advance.

*Marlin Cobb*

He has known defendant for about three years. At approximately 5 p.m. on November 12, 1974, he met defendant on the Dan Ryan "L" platform at 51st and Garfield. He and defendant rode the "L" together and walked to Jones Commercial High School which is located at State and Harrison. They arrived at 5:30 p.m. and attended their first class together. After the class ended at 6:55 p.m., they went to the washroom, smoked a cigarette and arranged to meet after their second class. They then parted and each went to his respective 7 p.m. class. At exactly 7:30 p.m. defendant walked by the doorway to his class and signalled that he was leaving. He checked the clock and, realizing that it was too early to leave, signalled defendant to leave without him.

*Defendant Charles Barber on his own behalf*

He substantially corroborated Marlin Cobb's description of the events of the early evening of November 12, 1974. He was a late registrant, had only started school one week before and had not purchased any books. After his cigarette with Cobb, he went to his next class, a Math and Science G.E.D. which lasted from 7 p.m. to 8:30 p.m. He arrived at that class at approximately 7 p.m. and signed the attendance sheet. A copy of the attendance sign-in sheet, which was admitted into evidence by stipulation, bears defendant's signature on the second line from the bottom, and the notation, "GED-Math Sci 11/12-7:00-602." At 7:30 p.m. the class began working on their textbooks and since he did not own one, he decided to leave. After signalling Cobb and receiving Cobb's acknowledgement, he left the building, walked out of the State Street entrance, walked toward Harrison, and went to Regal's liquor store located between Harrison and Congress. There he purchased cigarettes and a bottle of wine. He then walked south to Harrison, boarded a westbound Harrison Street bus, and purchased a transfer. He rode the bus for about five minutes to Halsted and Harrison, got off, and at approximately 7:55 p.m. walked across the street to the southbound Halsted bus stop. A campus police officer stopped him and asked him where he was going. He told him he was on his way home from school. The police searched him, found a knife and the wine and took him to headquarters. He was wearing a red knit cap and blue "knit" pants that evening. He denied raping or attacking the complainant, and stated that he had never been in the Behavioral Science Building.

On cross-examination he acknowledged that he always went to

school and returned home on the Dan Ryan "L" and that the night in question was the only time he did not do so. He acknowledged that it takes six minutes or more to ride from State to Halsted on the Harrison Street bus, and not five minutes as he had stated on direct. He stated that he reached the corner at exactly 7:50 p.m. and was waiting for two or three minutes before he was stopped by the police. He was unable to recall the subjects that were covered in his 7 class that evening or the name of anyone who attended that class with him.

## Opinion

■■ Defendant contends that he was not proved guilty beyond a reasonable doubt. Defendant correctly points out that in a criminal case such as this, the prosecution must prove beyond a reasonable doubt not only the commission of the crime charged, but also its perpetration by the accused. (*People v. McGee* (1961), 21 Ill. 2d 440, 173 N.E.2d 434.) Our supreme court has repeatedly held, however, that a positive identification by a single witness with ample opportunity to observe is sufficient to sustain a conviction (*People v. Clarke* (1971), 50 Ill. 2d 104, 277 N.E.2d 866; *People v. Williams* (1975), 60 Ill. 2d 1, 322 N.E.2d 819) even though said identification is contradicted by the accused. (*People v. Yarbrough* (1977), 67 Ill. 2d 222, 367 N.E.2d 666; *People v. Jones* (1975), 60 Ill. 2d 300, 325 N.E.2d 601.) In this case two witnesses, the complainant and Steve Liebovitz, positively identified defendant at a lineup some two hours after the incident in question and again at trial. We have previously noted that:

> "[I]t is neither the duty nor the privilege of a reviewing court to substitute its judgment as to the weight of disputed evidence or the credibility of witnesses for that of the trier of fact who heard the evidence presented and observed the demeanor of the witnesses." (*People v. Barksdale* (1976), 44 Ill. App. 3d 770, 775, 358 N.E.2d 1150, 1154.)

The sufficiency, weight and credibility of the witnesses' identification testimony as well as of all other evidence adduced, is clearly a matter for determination by the trier of fact, and that determination will not be reversed unless the evidence is so unsatisfactory, unreasonable or improbable as to create a reasonable doubt of defendant's guilt. *People v. Reese* (1973), 54 Ill. 2d 51, 294 N.E.2d 288; *People v. Rodriguez* (1978), 58 Ill. App. 3d 562, 374 N.E.2d 904.

In support of his contention, defendant first argues that the identification testimony referred to above was based on an insufficient opportunity to observe and was so uncertain that it could not sufficiently support his conviction. Defendant points out that following the incident, neither the complainant nor Steve Liebovitz was able to specifically

describe the offender's facial characteristics. He further points out that Liebovitz initially described the offender's jacket as suede with shoulder patches, while defendant wore a leather jacket without patches. Defendant also emphasizes that the complainant stated that the offender wore a blue cap, while his was red, that the offender's jacket was all brown leather, while his had blue and orange trim, and that she thought the offender's pants were denim, while his were of a "knit" material. Defendant concludes that these facts and the general circumstances under which the witnesses observed the offender cast sufficient doubt upon their identification so as to render it insufficient to support the trial court's determination of guilt.

■■■ We disagree with this argument. We note that Liebovitz realized at the lineup and admitted at trial that he was mistaken as to the appearance of defendant's jacket. The difference between his initial description of the jacket as suede with patches and subsequent realization that it was leather is somewhat explained by the fact that suede is a form of leather, and that defendant wore the jacket pulled up over his head as he ran by Liebovitz. Liebovitz's testimony indicates that he noticed defendant's frontal appearance more than the jacket on top of his head, and his early realization of his initial mistake regarding the jacket's composition tends to support his credibility on that point. Regarding the discrepancies defendant attributes to the complainant's testimony, we note that although she stated at trial that she thought the offender's pants were denim, she also stated that she did not actually touch them. In light of the traumatic nature of the experience, a tentative description of pants as "denim" instead of "knit" can in no way be considered a major discrepancy. The complainant did describe the offender's hat as blue, while defendant's hat at arrest was red. This is not even necessarily a discrepancy, since a cap is an article of clothing which is particularly easy to discard or change, and defendant, under any theory of the case, certainly would have had time to do so. However, more important than our conjecture on this or any of the other points defendant makes is the well-settled rule that any discrepancies or omissions of detail by an identifying witness do not destroy the validity of the identification, but instead go to the weight of the testimony and are to be evaluated by the trier of fact. (*People v. Sanford* (1975), 34 Ill. App. 3d 485, 340 N.E.2d 255; *People v. Bergeron* (1973), 10 Ill. App. 3d 762, 295 N.E.2d 228.) "Experience tells us that an identification is not usually made by distinguishing separate features but by the total impression made upon the witness." (*People v. Smith* (1977), 52 Ill. App. 3d 583, 587, 3€⁷ N.E.2d 756, 759 *cert. denied* (1978), 436 U.S. 961, 57 L. Ed. 2d 1127, 98 S. €t. 3079.) Accordingly, precise accuracy in describing the facial characteristics and clothing of a defendant is not necessary where the identification is

otherwise positive. (*People v. Harrison* (1978), 57 Ill. App. 3d 9, 372 N.E.2d 915; *People v. Jackson* (1974), 23 Ill. App. 3d 945, 320 N.E.2d 591.) The test of a positive identification is whether the witness was close enough to the identified person for a sufficient length of time under adequate conditions to observe and later make an identification. (*People v. Canale* (1972), 52 Ill. 2d 107, 285 N.E.2d 133; *In re Williams* (1974), 24 Ill. App. 3d 593, 321 N.E.2d 281.) In this case, the complainant viewed defendant, as he approached her in the foyer, from a distance of "about a foot." As he approached her she faced him and had ample time to view him under the fluorescent lights which illuminated the area. She positively identified defendant at a lineup some two hours after the incident, and again at trial. Our supreme court has stated that "[b]ecause a charge of rape is easy to make and hard to defend, the law requires that where the accused denies it the testimony of the prosecuting witness must either be corroborated or be clear and convincing." (*People v. Reaves* (1962), 24 Ill. 2d 380, 382, 183 N.E.2d 169, 170.) As we indicated above, the complainant's identification of defendant at a lineup shortly after the offense and at trial appears to be positive, clear and convincing. Moreover, her testimony is corroborated by the identification testimony of Steve Liebovitz. He had a full face view of defendant when defendant first stuck his head out of the washroom. When defendant then walked past him, with a jacket on his head but with his face and front torso exposed, Liebovitz again viewed him under the fluorescent lights in the hallway from a distance of about 3½ feet. Liebovitz independently identified defendant from five photographs and at a lineup shortly after the incident, and again identified defendant at trial. Based on the above, we cannot agree with defendant that the identification testimony adduced was insufficient to support his conviction beyond a reasonable doubt.

■ Defendant further argues that a reasonable doubt of guilt was raised by the testimony and evidence adduced in support of his alibi. Defendant points out that plausible alibi evidence cannot be disregarded where the only evidence contradicting it rests upon the identity of defendant as the perpetrator of the crime. (*People v. Ricili* (1948), 400 Ill. 309, 79 N.E.2d 509.) Defendant correctly points out that his activities early in the evening and before the occurrence in question were corroborated by Marlin Cobb and were uncontradicted. Defendant further argues, however, that sufficient consideration was not given to his testimony that he attended a class from 7 to 7:30 p.m., the period within which the crime charged occurred. Although he and Cobb parted company before his 7 p.m. class, defendant argues that his account is corroborated by his signature on the class sign-in sheet, which bears the notation "GED-Math Sci 11/12-7:00-602," and by Cobb's testimony that he signalled to defendant as

defendant walked by his class at 7:30 p.m. Defendant also emphasizes the credibility of his testimony that he left school at 7:30 and, after purchasing wine at a liquor store, boarded a westbound Harrison Street bus, purchased a transfer, and at approximately 7:55 p.m. alighted at Harrison and Halsted to catch a southbound Halsted bus. Defendant argues that this testimony is corroborated by his possession of a bus transfer stamped "8:00 p.m." Defendant argues that this and the sign-in sheet constitute irrefutable support of his alibi testimony, and that his alibi as corroborated raises a reasonable doubt of guilt and requires reversal of his conviction. In support of this argument, defendant cites and relies upon *People v. Gardner* (1966), 35 Ill. 2d 564, 221 N.E.2d 232, and *People v. Claudio* (1971), 3 Ill. App. 3d 309, 279 N.E.2d 39.

We reject defendant's argument, and find that his reliance on *Claudio* and *Gardner* is misplaced. Defendant attaches great importance to the 7 p.m. class sign-in sheet. Assuming, however, that defendant did sign that sheet at 7 p.m., he was in no way prevented thereby from being at the scene of the crime at 7:10 p.m. when the complainant testified that it occurred. This fact is supported by the testimony of defendant's own witness, C.T.A. bus driver Alvin K. Brown. Brown stated that in his experience, it takes "eight minutes *at most* [emphasis added]" to travel from State and Harrison, where defendant attended Jones Commercial High School, to Harrison and Halsted. That location is only two blocks east of Harrison and Morgan, where the crime occurred. The other piece of physical evidence which defendant offers as corroboration for his account of his alibi was the transfer which was stamped "8:00 p.m." Defendant points out that according to Alvin K. Brown, such a transfer would have to be issued between 7:45 and 8. He therefore argues that the transfer casts doubt upon the credibility of the State's theory that he boarded a bus at 7:45 p.m, was able to get a transfer and, after riding the bus for some two blocks, alighted at approximately 7:48 p.m. and waited for a different bus on a corner near the scene of a crime he allegedly had just committed. Initially, we note that as we indicated above, the credibility or plausibility of conflicting theories is for the trier of fact to determine. Moreover, defendant's emphasis on the time at which the bus transfer was issued is muted by Alvin K. Brown's statement that he sometimes punched transfers in advance. As Brown also stated contrary to defendant's argument, it is not unusual for passengers to alight from a bus after acquiring a transfer and riding a block or two. Although defendant urges that his theory that he was riding the bus home from school should have been believed, it is further weakened by his admission that the night in question was the only night he happened to deviate from his habit of taking the Dan Ryan "L" and chose instead to take the bus. It

is instructive to compare the evidence in this case with that presented in the *Claudio* and *Gardner* cases which defendant cites. In *Gardner* (1966), 35 Ill. 2d 564, 221 N.E.2d 232, the complainant's identification of the accused was uncorroborated by any other witness, there was no identification of the defendant at a lineup shortly after the incident, and the complainant's description of the defendant to the police differed in significant respects from her testimony at trial and defendant's actual appearance. Defendant therein testified that at the time the offense occurred, he was at a theater watching two movies. He described the movies at trial and also introduced into evidence a ticket stub which supported his alibi testimony that he was at the theater. Based on the weak identification testimony and the fact that the defendant's alibi as corroborated accounted for his whereabouts at the time the crime was committed, our supreme court ordered his conviction reversed. Similarly in *People v. Claudio* (1971), 3 Ill. App. 3d 309, 279 N.E.2d 39, the State presented one witness, whose testimony was uncorroborated. There was no lineup held following the occurrence. Moreover, defendant introduced work records, verified by his on-the-job superior, that established that defendant was at his regular place of work during the entire time in which the crime was allegedly committed. Accordingly, this court reversed the defendant's conviction.

The evidence in this case supporting reversal falls far short of the evidence heard in *Gardner* and *Claudio*. Unlike the situation in those cases, neither the class sign-in sheet nor the bus transfer produced and emphasized by defendant establish his whereabouts at the time of the occurrence, or render impossible his being present during the commission of the crime. As we indicated, defendant clearly had the time and opportunity to sign the class attendance sheet, commit the crime, and later acquire a bus transfer as described. Defendant testified that he saw Marlin Cobb after the crime, at 7:30 p.m., and Cobb's testimony agrees with defendant's on that point. However, the only evidence offered by defendant as to his whereabouts during the commission of the offense is his own testimony that he was in a class. Against this, and further unlike those situations in *Claudio* and *Gardner*, is the strong corroborated testimony of the two identification witnesses that defendant was present at and committed the crime. It is generally considered to be the province of the trier of fact to believe certain witnesses and disbelieve others. (*People v. Nicholson* (1965), 55 Ill. App. 2d 361, 204 N.E.2d 482.) More specifically, "[t]here is no obligation on a trial court to believe alibi testimony over positive identification of an accused * * *." (*People v. Jackson* (1973), 54 Ill. 2d 143, 149, 295 N.E.2d 462, 464.) After reviewing the entire trial record in this case, we conclude that the evidence adduced below was sufficient to support the court's determination and is not so

unsatisfactory as to create a reasonable doubt of defendant's guilt. Accordingly, the judgment of the circuit court is affirmed.

Affirmed.

MEJDA, J., concurs.

Mr. JUSTICE WILSON, dissenting:

I respectfully disagree with the conclusion reached by the majority and would reverse defendant's conviction, based upon my belief that the State did not prove him guilty beyond a reasonable doubt.

The basic conflict in the evidence in this case lies between the State's identification testimony pointing to defendant as the perpetrator of the brutal attack on complainant, and the alibi defense, placing defendant a mile and a half away during the time of the commission of the offense. My review of the record leads me to conclude that the State failed to effectively impeach the exceptionally strong alibi evidence presented in this case. I further find that the identification testimony was weakened in certain crucial respects.

Defendant's alibi was corroborated by two articles of physical evidence, namely, the attendance sheet for the 7 p.m. class bearing defendant's signature, and a bus transfer that was issued between 7:45 and 8 p.m. on the night of the attack. The admission of the attendance and sign-in sheets was stipulated to by the State. At the top of the sign-in sheet, the notation "GED-Math Sci 11/12-7:00-602" appears. The State did not attempt to prove that defendant signed in before 7 p.m. as it could have through the testimony of other students, and the fact that defendant's signature appears on the sheet on the second line from the bottom buttresses his account that he signed in at 7 p.m. or shortly thereafter. The following remarks made by the trial judge, prior to denying defendant's motion for a new trial, reflect that even he believed this aspect of defendant's account of events:

> "Regarding the alibi * * * I did not disregard the school records. * * * [T]here is no corroboration as to where the defendant was between 7 and 7:30, the alleged rape having occurred somewhere after 7, somewhere before 7:30."

My colleagues on the majority also seem to concur that at 7 p.m. on the night of the attack, defendant was at Jones Commercial High School. However they state, "[a]ssuming, however, that defendant did sign that sheet at 7:00, he was in no way prevented thereby from being at the scene of the crime at 7:10, when the complainant testified that it occurred."

As the majority correctly points out, according to the complainant's testimony on direct, the attack occurred at approximately 7:10 p.m.

However during cross-examination she testified that the attack occurred at 7:05 p.m. Since she also testified that the rape occurred shortly after she walked down the length of the hallway from her class, which concluded at 7, it is probable that the attack occurred closer to 7:05. Brown, the bus driver, testified that it was an eight-minute bus ride from the location of Jones Commercial High School to Harrison and Halsted, where defendant was accosted by police and arrested. The attack occurred even two blocks further away inside a building at Harrison and Morgan which adds even more time to defendant's travels. According to the State's version of defendant's activities, he signed in his class at 7 p.m. or shortly thereafter, walked outside, immediately caught a westbound bus, alighted, walked two blocks further to the Behavioral Science Building of the University of Illinois, spotted his victim, watched her a few minutes, and began his attack at 7:10. Although the majority seems to believe that this sequence of events could have physically occurred within 10 minutes, I have grave reservations. My doubts are further exacerbated by the probability that only 5 minutes had elapsed between defendant's alleged departure from school and the time of the attack, if one were to accept complainant's testimony during cross-examination. Even · more disconcerting·than the time constraints, is the State's utter failure of proof in this regard. The State's version is based on mere speculation and falls far short of the evidence necessary for proof beyond a reasonable doubt.

On the other hand, defendant's account of his activities is plausible and remains unimpeached. He testified that he left school at 7:30, walked to a liquor store and purchased the bottle of wine that was later found on his person, and then caught a westbound bus that put him on the corner of Harrison and Halsted at 7:50 p.m. Defendant's departure time from school was corroborated by Cobb who remained unimpeached. The State failed to introduce the testimony of other students who could have countered defendant's and Cobb's accounts of when defendant left class. In *People v. Claudio* (1971), 3 Ill. App. 3d 309, 279 N.E.2d 39, the court was impressed with defendant's alibi, corroborated by his employment records, which put him at work during the day and hours in question. Although the attendance sheet in the instant case put defendant at school 10 minutes at most before the time of the attack, I find that, given the distance he had to travel, by bus and by foot, it lends great support to his alibi.

The majority suggests that defendant's alibi is somehow discredited by his admission that the night in question was the only time he took a bus, deviating from his habit of taking the Dan Ryan "L". However, the majority ignores the fact that defendant only began school the week before and thus did not yet have a long standing practice of taking one form of transportation over another.

Furthermore, a bus transfer, stamped "8:00 p.m.," was found on defendant's person when he was arrested. Brown, who issued the transfer, testified that he rounded the time that he punched the transfer to the next ¼ hour in accordance with CTA practice. Therefore, the transfer was issued between 7:45 and 8:00 p.m. It is less plausible that defendant caught a bus, purchased a transfer and deboarded two blocks later within the same area that he committed a crime as the State would propose, and the majority would believe, than that he caught a bus at approximately 7:45 p.m. near school, purchased a transfer and rode to Harrison and Halsted in anticipation of transferring to a southbound bus which would take him home. According to Officer Atwood, he even told the police when he was arrested that he was en route from Jones Commercial High School to his home. Similarly, in *People v. Gardner* (1966), 35 Ill. 2d 564, 221 N.E.2d 232, the court found defendant's alibi of going to a movie to be corroborated by an unimpeachable source when ticket stubs were found in defendant's pocket and the theatre manager testified that the stubs were issued between certain times.

In addition to the strong alibi evidence, I believe the identification testimony in this case was weakened in certain respects. As the majority states,

> "The test of a positive identification is whether the witness was close enough to the identified person for a sufficient length of time under adequate conditions to observe and later make an identification. (*People v. Canale* (1972), 52 Ill. 2d 107, 285 N.E.2d 133; *In re Williams* (1974), 24 Ill. App. 3d 593, 321 N.E.2d 281.)"

Liebovitz's opportunity to observe the assailant was of a short duration and limited in scope, in that only the man's face and shirt were exposed at the time. In fact, at the preliminary hearing, he testified that he only caught a "glimpse" of the man's face. He was also mistaken as to the material and length of defendant's coat as he realized at the lineup. (See *People v. McGee* (1961), 21 Ill. 2d 440, 173 N.E.2d 434.) Even the majority seems to partially explain Liebovitz's error in the description of the jacket by the fact that "defendant wore the jacket pulled up over his head as he ran by Liebovitz." This could hardly be said to be the optimum opportunity by which to view a person for purposes of an identification.

Although according to complainant's testimony at trial, her opportunity to observe her attacker's face and clothing was certainly longer than Liebovitz's, her credibility is weakened by her failure to inform the police, shortly after the attack, of her ability to directly view her assailant for a few minutes. At trial, she stated that after the first few minutes in the foyer, she never viewed her assailant's face again because she was ordered to cover her head with her coat. Given the fact that

complainant had no particular reason to examine the physical characteristics of her assailant prior to the attack (*People v. Reese* (1973), 14 Ill. App. 3d 1049, 303 N.E.2d 814), and she was completely unable to see him during the course of the attack, I disagree with the majority that the circumstances here afforded complainant a favorable opportunity for a clear and positive identification of defendant as her attacker. (*People v. Thompson* (1970), 121 Ill. App. 2d 163, 257 N.E.2d 197.) I further mention that complainant described defendant primarily by his clothing and height and not by his facial characteristics which further weakens her identification of defendant. See *People v. McGee* (1961), 21 Ill. 2d 440, 173 N.E.2d 434.

Although identification on the basis of clothing is entitled to some weight (*People v. McGee* (1961), 21 Ill. 2d 440, 173 N.E.2d 434), even this aspect of complainant's identification testimony was weakened. Complainant was positive that her assailant wore a blue wool knit hat, although she acknowledged that defendant wore a red knit cap in the lineup that evening. Although mere discrepancies in description are not enough to raise a reasonable doubt of guilt (*People v. Reedus* (1977), 46 Ill. App. 3d 427, 361 N.E.2d 33; *People v. Witherspoon* (1975), 33 Ill. App. 3d 12, 337 N.E.2d 454), here, given the totality of the evidence, the disparity in the color of the hat is of some significance. A perusal of the lineup photograph in this case, shows that defendant was wearing a bright red cap. To account for the two different colored caps, defendant would have had to change hats after the attack and dispose of the blue one, since he had only one cap when he was arrested. As with many of the other explanations that one would have to accept to affirm defendant's guilt, I believe the explanation of innocence is far more reasonable.

As in *People v. Gardner* (1966), 35 Ill. 2d 564, 221 N.E.2d 232, where our supreme court reversed defendant's conviction for rape, the only link between defendant and the crime, aside from the identification testimony, was his proximity to the location of the attack shortly after it occurred. In *Gardner*, as here, the identification testimony was weakened in part by discrepancies in clothing description. Finally, in both cases, defendant had an alibi, corroborated by strong and even more importantly, unimpeached physical evidence.

Finally, in several of the cases where the courts have reversed convictions for rape on the basis of less than strong identification, and unimpeached alibis, the alibis offered were not corroborated by physical evidence and were far less convincing than the one presented in the case at bar. Compare *People v. Reese* (1973), 14 Ill. App. 3d 1049, 303 N.E.2d 814; *People v. Moore* (1973), 12 Ill. App. 3d 78, 298 N.E.2d 202; *People v. Adams* (1969), 115 Ill. App. 2d 360, 253 N.E.2d 23; *People v. Appleby* (1968), 104 Ill. App. 2d 207, 244 N.E.2d 395.

I would reverse defendant's conviction in this case. Accordingly, I dissent from the decision reached by the majority here.