THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* EARL BIBBS, Defendant-Appellant.

First District (4th Division)    No. 80-1015

Opinion filed November 5, 1981.

James J. Doherty, Public Defender, of Chicago (Andrea D. Lyon and Ira Churgin, Assistant Public Defenders, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Georgia A. Buglass and Gloria G. Coco, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE JOHNSON delivered the opinion of the court:

After a jury trial, defendant, Earl Bibbs, was convicted of rape (Ill. Rev. Stat. 1975, ch. 38, par. 11—1), armed robbery (Ill. Rev. Stat. 1975, ch. 38, par. 18—2), and burglary (Ill. Rev. Stat. 1975, ch. 38, par. 19—1). He was sentenced to 25 to 50 years for rape and armed robbery and 5 to 15 years for burglary, said sentences to run concurrently.

On appeal, defendant presents the following issues for review: (1) whether he was proved guilty beyond a reasonable doubt; (2) whether the prosecutor's arguments were improper and inflammatory; (3) whether the trial court abused its discretion by refusing the jury's three requests for a transcript of the complainant's description of her assailant and by giving an improper and coercive instruction to the deadlocked jury.

We affirm.

It was stipulated at trial that the vaginal smears taken from the victim and the sheet taken from the bed contained human spermatozoa.

The testimony at trial was as follows. Chicago police officer Paul Ruther stated that on August 4, 1976, he received a call that a burglary had

just occurred, and at 3:30 a.m., he arrived at the scene. After conversing with the complainant, he made a visual check of the entire apartment and found that the telephone wire had been cut and a purse had been emptied on the couch. The apartment was well lit. Officer Ruther transported the victim to Edgewater Hospital. Ruther also testified that he gave a description of the offender over the radio which indicated the person was a male Negro, approximately 25 to 30 years old with a thin build, and wearing wire-rimmed glasses and a light-colored sweatshirt. On cross-examination, the officer stated that he prepared a report with regard to the incident. He did not ask the victim about the height, complexion, or physical deformities of the offender.

The complainant testified that she fell asleep reading on the night of August 3, 1976. She awoke around 3 a.m. and began calling her cat. She heard footsteps; thereafter she heard a male voice call from her hallway, "Lady, lady, can you hear me? If you hear me, say yes. Don't do anything." The witness was wearing a T-shirt and cotton briefs. She replied that she could hear him. The intruder instructed her to lie face down on the bed. A man then entered her bedroom and she looked at him. He was dressed in a light-colored T-shirt or sweatshirt, wore sunglasses, and carried a knife with a fairly long blade angled at the end. He told her not to look at him and that he needed money. She looked at him. He again told her not to look; she turned her head. He cut the bedding with the knife, using the strips to tie her feet, gag her, and blindfold her.

The complainant further testified that when the offender led her from the bedroom into the living room, she could still see through her blindfold. He asked her about money, saw her handbag and emptied it. He led her back into the bedroom and instructed her to lie face down on the bed again; he then cut the telephone wire and again asked about money, saying, "There has to be some money here." He asked whether she had a television set. She told him yes and he proceeded into the living room to get it, warning her not to do anything or he would hang her in her apartment. Upon returning to the bedroom with the television set, he told her they were going to have "a little fun." The witness identified defendant as the offender. She stated that defendant ordered her to get on her knees with her head down and her hands behind her. He asked whether she wanted to perform fellatio or have sexual intercourse. She stated neither. Then he put the knife in front of her face so that she could see it from under the blindfold. She said she would have intercourse and she pulled down the briefs she was wearing. Defendant took the bottle of Vaseline intensive care lotion and applied it to her genitals. Defendant then inserted his penis into her vagina. When defendant stopped, he said he "had to get going," and wiped the fingerprints from the bottle. Next,

defendant asked her about the keys to the back door and she explained to him where they were. He brought the keys to her and she pointed out the back door key. He said he was leaving with the television set and would return for the stereo.

The witness stated that after defendant left, she waited for a few minutes and then went across the hall to the neighbors' apartment. She told them who she was and that someone had been in her apartment. After the police were called, she telephoned her sister. When the police arrived, she returned to her apartment. The television set was gone and $7 was missing from her purse. A window in the dining room was opened. She moved out of her apartment that night.

The victim had bruises on her wrists and slight vaginal bleeding. She talked with Detective Klein and later with Sergeant Stankowicz. Stankowicz showed her some mug shots; she could see a similarity in one of the photos but she did not identify anyone. In mid-September 1976, she went to the police station and viewed a lineup where she identified defendant as the person who was in her apartment and further recognized defendant through voice identification.

On cross-examination, the victim's testimony substantiated what she stated on direct examination. She indicated that a description of defendant's facial characteristics was given to Detective Klein. The victim did not remember whether she told Klein defendant had a moustache or goatee, but she did tell him that the offender was very articulate, tall, and thin.

Detective Walter Klein testified that he was an investigator for the Chicago Police Department. On August 4, 1976, he went to Edgewater Hospital to investigate a rape. He had a conversation with the victim. He arrested defendant Bibbs at his apartment, which was approximately 150 yards from the victim's residence.

On cross-examination, Detective Klein stated he prepared a police report relating to his conversation with the complainant concerning the rape. Klein's report indicated that the victim said she awoke around 3 a.m. and got up to see where her cat was. As she walked down the hall in her apartment, she heard a voice say, "Don't scream and I won't hurt you." She observed the offender walking toward her but could not see him clearly. The offender then led her back to the bedroom. The report did not give a description of the offender's length of hair or his complexion.

In his testimony, Klein stated that he remembered defendant had been arrested around August 11, 1976, in connection with another rape not far from where the incident took place. Klein interviewed Bibbs, who stated he was at home with his girlfriend during that time. After verifying this with the girlfriend and Bibbs' co-worker, who had talked to Bibbs while he was at home, defendant was released.

On redirect examination, Klein stated that although the victim of the August 11 rape viewed a lineup in which Bibbs participated, she did not identify Bibbs. Defendant was arrested September 16, 1976 for the rape of complainant.

The defense's first witness, Ilene Gans, testified that she and defendant lived together during the summer of 1976 at 1200 West Pratt, Chicago. On August 3, 1976, she and defendant went to bed around 11 p.m. They awakened the next morning at 5:30 a.m. The witness identified a photo as that of defendant Bibbs. He was pictured with a moustache and goatee.

On cross-examination, Gans stated that she began living with defendant in June 1976. She did not wake up during the night of August 3. When she did awaken the next morning, Bibbs was beside her. Defendant always had facial hair consisting of a goatee and a moustache. She did discuss with defendant the events of August 3 and 4.

Defendant testified in his own behalf. He stated that on August 3, 1976, he was living with Ilene Gans and that he slept with her that night. He denied entering the apartment of the complainant or having intercourse with her. Defendant stated that on August 3 he had a moustache and a light beard (goatee). On cross-examination, defendant stated that Gans lived at 1200 West Pratt and that he had moved in with her.

James W. Osterburg testified that he is a professor and head of the Department of Criminal Justice at the University of Illinois. He stated that he analyzed the fingerprints of Bibbs against a latent print taken from a Vaseline intensive care container found on the victim's bed. He concluded it was not Bibbs' print. On cross-examination, Osterburg stated that he did not compare the latent print found on the container with the victim's print.

Rebuttal testimony was given by officer Herbert Kluth who stated that he is qualified as an expert on fingerprint analysis. When examining fingerprints, the goal is identification. He stated that from the latent print found on the Vaseline container, he could not tell who put that print on or when it was put on.

Defendant first contends his guilt was not proved beyond a reasonable doubt. We initially note that while a reviewing court will not disturb the jury's determination of guilt unless the evidence is so improbable as to raise a reasonable doubt of guilt, the positive and credible testimony of a single occurrence witness is sufficient to support a conviction, notwithstanding contrary evidence by the accused. *People v. Hampton* (1979), 78 Ill. App. 3d 238, 241, 397 N.E.2d 117, 119.

It is the position of defendant that the victim's identification was made under adverse circumstances and was the product of a suggestive lineup. The test of a positive identification is whether the witness was close enough to the identified person for a sufficient length of time under

adequate conditions to observe and later make an identification. (*People v. Barber* (1979), 70 Ill. App. 3d 540, 548, 388 N.E.2d 833, 839.) The record certainly indicates that the complainant had sufficient opportunity to observe her assailant during the commission of the crime. However, defendant argues that the discrepancies in the victim's testimony and the identification of a mug shot of someone else as the assailant shows that the victim's identification of defendant was insufficient. But, it is clear that discrepancies or omissions of detail by an identifying witness do not destroy the validity of the identification but go instead to the weight of the testimony and are to be evaluated by the trier of fact. *People v. Villalobos* (1979), 78 Ill. App. 3d 6, 12, 396 N.E.2d 1081, 1086.

■■ As we stated above, the victim had ample opportunity to observe her assailant and did in fact positively identify defendant. We conclude that the testimony of the complainant was positive and sufficient to support defendant's conviction.

Defendant argues that he was prejudiced by the prosecutor's arguments which were inflammatory and prejudicial. The statements contested by defendant are as follows: the prosecutor told the jury that the "United States Supreme Court has said that armed robbery is a whisper away from murder." Defense counsel's objection to this remark was sustained by the trial court. In his closing argument, the prosecutor stated that he would "clear away some of the smoke screens that were just put up by the defense attorney" and the defense evidence concerning exclusion of the fingerprint was "an issue put up to confuse you." The prosecutor also stated that "experts are like bananas, you can buy them by the bunch." Finally, the prosecutor stated, "We only bring cases that we can prove beyond a reasonable doubt."

■■ While it is improper for the prosecutor to place the integrity of the office of the State's Attorney behind the credibility of a witness, it is equally well established that the prosecutor may discuss the witnesses and their credibility, and he is entitled to assume the truth of the State's evidence. (*People v. Anderson* (1981), 95 Ill. App. 3d 492, 495-96, 420 N.E.2d 830, 833.) In our view, the prosecutor's remarks fell within the bounds of permissible comment directed to the credibility of the witnesses and the evidence in the case. Further, the prosecutor's comment suggesting that a smoke screen was put up by the defense was intended merely to charge the defense counsel with obscuring the evidence and, therefore, it is not reversible error. *People v. Lavoy* (1980), 91 Ill. App. 3d 639, 644, 415 N.E.2d 487, 491.

Finally, defendant asserts that the trial court abused its discretion by refusing the jury's three requests for a transcript of the victim's description of her assailant and by giving an improper and coercive instruction to the deadlocked jury.

■■ The courts of Illinois have held that the allowance or refusal of a request by the jury for a transcript of testimony in connection with its deliberations is within the discretion of the trial court. (*People v. Pierce* (1974), 56 Ill. 2d 361, 364, 308 N.E.2d 577, 578; *People v. Singletary* (1979), 73 Ill. App. 3d 239, 254, 391 N.E.2d 440, 451.) However, a request of this type may not be summarily rejected. The ruling by the trial court must be a product of the exercise of discretion. (*Singletary*, at 254.) Moreover, a decision within the trial court's discretion will not be disturbed on appeal unless there has been an abuse of discretion. *Pierce*, at 364.

In the exercise of its discretion, the trial court is charged with determining whether a review of the testimony requested would be helpful or harmful to the jury's proper deliberations. (*People v. Bell* (1976), 44 Ill. App. 3d 185, 193, 357 N.E.2d 1256, 1263.) Surely a plausible starting point for this inquiry is whether the jury thinks it would be helpful (*Bell*, at 194) and whether there is a possible basis for the jury's belief (*People v. McClellan* (1979), 71 Ill. App. 3d 611, 616-17, 390 N.E.2d 131, 136). In *Pierce*, at page 364, the supreme court stated:

> "The trial court will have a full knowledge of the case. It will know the charges against the accused, the witnesses and their supporting or defeating testimony and other evidence which may have been presented. It will be in a position to assess the request and judge whether a review of testimony, considering the circumstances, will be helpful or hurtful to the jury's proper deliberations. This question of review, like so many others which appear in the course of trial, is best entrusted to the trial court's sound discretion."

In view of the facts and circumstances of the instant case, we find that the trial court did not abuse its sound discretion when it refused to grant the jury's specific request for a transcript of the complainant's testimony.

The record reveals that the trial court properly and conscientiously denied the jury's initial request for a review of the testimony. The first jury note requested: "We would like a copy of what was actually said by [the complainant] regarding defendant's description." The trial judge determined in his discretion that he would "not make this available. Please continue to deliberate." The second note stated: "[W]e have agreed and are at an impasse. We feel if we could review [the complainant's] testimony regarding her description of the defendant it would aid us greatly in resolving this area of difference of opinion." The judge then responded that they had heard all the evidence, they should discuss the evidence among themselves and continue to deliberate. A third request was sent to the judge: "We feel strongly that [the complainant's] testimony, regarding her description of the defendant, is critical to a resolution. Jurors have different recall of her testimony. I don't believe we'll resolve

our different opinions without this testimony." The judge determined that "reading a portion of [the complainant's] description of the defendant might tend to confuse the jury. And, therefore, I will not allow your request." A final request was sent to the judge stating the following:

"The last three votes have been nine to three. The central issue is still [the complainant's] testimony regarding the defendant's description. * * * We still believe the actual testimony of [the complainant] would aid us greatly in resolving this issue.

* * * At this point I believe we are at an impasse, we cannot reach a unanimous decision."

The judge called the jury out and his final instruction to them was to "continue to deliberate."

██ In the case at bar, it is apparent that the judge knowingly exercised his discretion and made a determination that a review of the complainant's testimony would confuse the jury. Moreover, we do not believe that the decision of the trial court was injurious to defendant, since the jury had heard the testimony elicited at the trial, witnessed the manner and demeanor of the witnesses, and was qualified to determine the credibility of their testimony. (*People v. Reynolds* (1978), 57 Ill. App. 3d 593, 598, 373 N.E.2d 650, 654.) Therefore, we hold that the trial court did not abuse its discretion when it did not allow review of the requested testimony.

After the judge gave his final denial of a review of the complainant's testimony, he called the jury out and gave the following instruction:

"You are to be the judges of the facts in the case and in that connection are the judges of the credibility of the witnesses, that is to say, the question of whether or not the witnesses are telling the truth and the weight to be given to their testimony. It is my duty to tell you what evidence you may hear.

After the jury has heard all the evidence in the case and the arguments of counsel based thereon, and received the written instructions of the Court as to the law that is applicable to this case, it will be the duty of the jury to determine whether the defendant is guilty or not guilty.

My only observation is that the questions that you have sent to me in the last two days have been questions of fact and questions of fact have to be decided by the jury.

So, please, Miss Sheriff, they will continue to deliberate."

Defendant asserts that the effect of this instruction was to coerce a jury verdict and that the judge should have given the deadlocked instruction as directed in *People v. Prim* (1972), 53 Ill. 2d 62, 289 N.E.2d 601, *cert. denied* (1973), 412 U.S. 918, 37 L. Ed. 2d 144, 93 S. Ct. 2731. In *Prim*, at pages 75-76, the court said:

" 'The verdict must represent the considered judgment of each

juror. In order to return a verdict, it is necessary that each juror agree thereto. Your verdict must be unanimous.

It is your duty, as jurors, to consult with one another and to deliberate with a view to reaching an agreement if you can do so without violence to individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations, do not hesitate to reexamine your own views and change your opinion if convinced it is erroneous. But do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict.

You are not partisans. You are judges—judges of the facts. Your sole interest is to ascertain the truth from the evidence in the case.' "

A trial judge, when dealing with a jury that appears to be deadlocked, should not leave it "to grope in such circumstances without some guidance from the court." (*Prim*, at 74.) The purpose of the *Prim* instruction is to assure that, in a case where a jury is deadlocked, the jurors will closely examine their competing views and try to reach a unanimous verdict. The language of the instruction has been approved by our supreme court as being nonprejudicial to defendant's right to a fair trial when the instruction is given to a deadlocked jury. *People v. McNeal* (1981), 94 Ill. App. 3d 1000, 1004, 419 N.E.2d 460, 464.

The Illinois Supreme Court stated in *People v. Prim* (1972), 53 Ill. 2d 62, 76, 289 N.E.2d 601, 609-10:

"[W]e direct that hereafter the trial courts of this State when faced with deadlocked juries comply with the Standards suggested by the American Bar Association Minimum Standards Relating to Jury Trials * * *."

Although the instruction given by the trial court did not constitute reversible error, we hold that the mandate of the supreme court in *Prim* should have been followed.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

ROMITI, P. J., and JIGANTI, J., concur.